BEVERLY JEAN LANDERS *v.* STATE OF INDIANA.

[No. 2-973A205. Filed July 31, 1975. Rehearing denied September 18, 1975. Transfer denied December 15, 1975.]

*James A. Neel, Richard A. Clem,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Wesley T. Wilson,* Deputy Attorney General, for appellee.

## CASE SUMMARY

BUCHANAN, J.—Defendant-Appellant Beverly Jean Landers (Landers) appeals from a jury conviction of voluntary manslaughter claiming: (1) a search warrant was not based upon sufficient probable cause because not based on credible hearsay; (2) a mistrial should have been granted because a regular juror was replaced by an alternate juror during trial; (3) a fair trial was denied because of the admission into evidence of gruesome photographs; (4) reversible error was committed in the admission into evidence of a box of .22 calibre bullets not specifically listed in the search warrant and which were not listed on the original return of the search warrant; and (5) insufficient evidence to support the conviction.

We affirm.

## FACTS

The evidence and facts most favorable to the State and in support of the judgment of conviction are:

Landers and Felix Eugene Robinson were married on July 2, 1970 and were divorced approximately six months later. They continued seeing each other after the divorce, their relationship being marked with heated arguments and violence.

They were both residents of Indianapolis, Indiana, Landers being employed at the Hideaway Lounge in Indianapolis and Robinson at the Elliott-Williams Company.

Landers was a reader of mystery stories.

On Saturday evening, March 13, 1971, they appeared to-

gether at about 10:45 p.m. in the Goldfinger Tavern and were later seen between 2:00 and 2:30 a.m. at Mary Lee's Keystone Bar. Robinson was not seen alive thereafter.

Parts of Robinson's dismembered body were later found at three separate locations. Officer William Jackson of the Brownstown City Police Department found the first part on March 16, 1971 between Seymour and Columbus, Indiana, near Highway 31, consisting of part of Robinson's torso (severed at the waist) and his legs severed at the knees.

A second part of Robinson's body was found near State Road 67 south of Mooresville, Indiana in April of 1971 and was described by the finder as a "big hunk of meat".

On May 1, 1971, Robinson's head was found near Waverly, Indiana.

A laboratory analysis established that the "big hunk of meat" found near Mooresville was actually a portion of Robinson's left chest wall and fit reasonably well together with the first part found near Seymour.

Expert testimony established that a saw had been used to cut the chest wall and both a saw and a knife had been used on the first part. Autopsy also revealed that there were two gunshot wounds in the left side of the head and X-rays revealed that the bullets still lodged in the brain were .22 calibre bullets and were the cause of death.

Dental records and X-rays supplied by Robinson's dentist also established the identity of the head.

In October or November of 1970 Landers approached a frequent customer of the Hideaway Lounge and asked whether he would sell her a gun and, approximately a week later, she purchased from him a .22 calibre revolver for $15. She had previously made a deposit on another gun but had failed to pick it up. Subsequent to the divorce Landers exhibited the .22 calibre revolver to a fellow employee at the Hideaway and stated that if Robinson ever bothered her again she would use the revolver to "blow the son-of-a-bitch's brains out". This threat was apparently related to other employees

prior to Robinson's disappearance at times when Landers would arrive at work with cuts and bruises. This gun was sold to one Danny J. Eaton and was later admitted in evidence.

In one of the altercations between Robinson and Landers at Landers' home, a television set was destroyed which caused Landers to make the statement that Robinson would regret having destroyed the set.

A personal friend of Landers (Pernie Foxworthy) testified that Landers told her if she ever wanted to get rid of anyone to let her know and she would help so that no one would ever know anything about it. Also, Landers told this friend that she had bought a gun and if Robinson ever tried to break in on her again she was going to kill him. The same friend stated that Landers said Robinson had tried to strangle her with the telephone cord and she had hit him over the head causing a cut and that this cut caused blood on the spread and curtains in her home.

She also related that Landers told her on the Wednesday evening following the Saturday night disappearance of Robinson on March 13, 1971, that she had been sick and was not feeling well and that the last time she had seen Robinson was when they returned to her home after leaving Mary Lee's Tavern and that Robinson had become mad when he discovered there was no coffee or food in the home and had departed.

There was also testimony that Landers told another friend (Rene Robinett) on Sunday, March 14, in response to a question as to whether Landers had seen Robinson, she said, "No, but you don't have to worry about him. I already took care of him."

Another customer of the Hideaway Lounge, one Ronald E. Gooley, related that he had been an acquaintance of Landers for approximately five years and had occasionally done work for her at her home. He recalled that sometime in February of 1971 and possibly the first part of March of that year while at her home she showed him a .22 calibre pistol which she had in her purse, stating she had it for protection in case

her ex-husband tried to break in and beat her up. She also stated to him that if Robinson ever broke in the home she would shoot him and inquired if she did so whether Gooley would help her get rid of him. She further asked him if he would help her cut him up and several days later she asked him if he knew anyone who would help her get rid of a body.

On a Sunday in the middle of March, Landers came to Gooley's home and told him not to come around her house anymore because she was afraid of trouble. He accompanied her that day to a store on Michigan Street to rent a saw, ostensibly to fix her garage and she purchased a circular power saw, although she stated she desired a chain saw.

They then returned to her home with the saw and Landers showed Gooley a cement sack in her basement with two holes in it, stating that she had tried her pistol out by firing two shots in the sack.

He next accompanied her to a store on Arlington Avenue for the purpose of purchasing a trash barrel which was taken to Gooley's home.

Landers returned home to get some material which she wished to burn, explaining they were bloody sheets resulting from a recent miscarriage. The bloody sheets were placed in the barrel and sprinkled with gasoline and set on fire. Gooley stated they had an odor similar to garbage. The two of them watched for approximately two hours as the contents of the barrel burned.

Accompanied by a friend, also on Sunday, March 13, Landers drove to Robinson's place of residence and gave a bundle of Robinson's clothes to his uncle with whom he was residing.

As a result of a search warrant obtained by Sergeant Robert J. Allen of the Indiana State Police, numerous items taken from Landers' home were admitted into evidence. Five of these items were found to be covered with human blood, Type O, and four exhibits contained human blood, Type A, and it was testified that blood from Robinson's torso was of

the major group O. Blood stains on articles of women's clothing in Landers' home were found to be of Type A.

There was expert testimony that the .22 calibre revolver sold by Landers to Danny Eaton could have discharged the .22 calibre bullets retrieved from Robinson's head. The class characteristics of the test bullets fired from Eaton's revolver were of such a nature that "they could have been fired from that gun".

Landers had originally been charged on May 7, 1971 by an indictment charging her with First Degree Murder. After a Special Judge qualified, Landers made a motion to suppress the evidence gained from the search of her home and a hearing was held on the Motion to Suppress on March 14, 1972, which was thereafter denied prior to trial.

Jury trial was held on April 12, 1973, with the jury returning a verdict of Voluntary Manslaughter. Landers was sentenced to the Indiana Women's Prison for not less than two nor more than twenty-one years, and she appeals.

ISSUE ONE

Was the Affidavit in support of the search warrant insufficient because not shown to be based upon credible hearsay?

Landers' argument as to the insufficiency of the Affidavit in support of the search warrant is that, while the Affidavit may be based on hearsay, the hearsay must be credible and the affiant must make affirmative allegations that the credible person spoke with personal knowledge and that the facts were within the personal knowledge of the credible person and further that the affiant must state the facts within his knowledge as to the credibility of the credible person.

The State fails to favor us with any citation of authority or cogent argument on this subject other than to say that the method used by the affiant was the same method by which the court would have made such determination as to credibility of the informants.

## ADDITIONAL FACTS

On May 9, 1971 Sergeant Allen, the Indiana State Police officer investigating the disappearance of Robinson, obtained a search warrant for Landers' residence and automobile. The affidavit on which the search warrant was based consisted of thirteen pages reciting in detail the basis for probable cause that Landers had murdered Robinson on March 14, 1971 by shooting him with a .22 calibre revolver and dismembering and concealing his body. The source of this information came from his own personal knowledge and hearsay from Captain Ray Thompson of the Indiana State Police Laboratory; Dr. James A. Benz, a pathologist of the Marion County General Hospital; Pernie Foxworthy, a close personal friend of Landers for eight or nine years; Frances Havley, a friend and fellow employee of Landers who had known her for twelve years; Mabel Risk, a kitchen worker at the Hideaway Lounge; Ronald E. Gooley, a friend who had dated Landers from time to time and was a customer of the Hideaway Lounge; Carson Shepherd, with whom Robinson was living at the time of his disappearance; Richard Waggoner, a friend of Landers; Dorothy and Danny Barnett who had cleaned Landers' home on May 7, 1971; and John Linehan, a private investigator employed by Robinson's sister to locate him. The Affidavit further stated that the affiant had undertaken a full-time investigation beginning March 16, 1971.

The credibility of each of these witnesses was separately stated in the Affidavit:

1. Captain Ray Thompson of Indiana State Police Laboratory—Affiant had been associated with him in police work for seven years, during which time Captain Thompson had been employed and active in the identification and analysis of evidence in the Indiana State Police Laboratory.

2. Dr. James A. Benz—known to affiant as an experienced medical doctor employed as Chief Pathologist at the Marion County General Hospital.

3. Pernie Foxworthy—thought to be credible because she

submitted to a polygraph test on April 14, 1971, administered by Sergeant Kenneth Hauck of the Indiana State Police who informed affiant that the information related to him by Pernie Foxworthy was without deception.

4. Frances Havley—her information credible because her answers were straightforward and not evasive, thoughtful, and without any indication in tone, manner or expression that the answers given were memorized or fabricated or based on anything other than honest recollection and memory.

5. Mabel Risk—same reasons for credibility as Frances Havley.

6. Ronald E. Gooley—his information thought to be credible because of interviews with persons who verified part of Gooley's information, i.e., rental of the saw and purchase of a 55 gallon trash barrel.

7. John Linehan—known by affiant to be credible because he was a former Chief Detective of the Marion County Sheriff's Department with fine reputation.

8. Richard Waggoner—Hearsay credible because of his opportunity to observe Landers and her home during a five-year period during which he had lived on the premises with Landers.

9. Carson Shepherd—thought to be credible for same reasons as Frances Havley.

10. Dorothy and Danny Barnett—thought to be credible for same reasons as Frances Havley.

In each instance Sergeant Allen alleged that the informant spoke with personal knowledge of the matters contained in the Affidavit.

## DECISION

CONCLUSION—The Affidavit in support of the search warrant was based on credible hearsay and therefore the motion to suppress the evidence gained from the search of the premises was properly overruled.

Landers' attack on Sergeant Allen's Affidavit is confined to lack of facts as to the credibility of the informants. No assertion is made that the informants did not speak as to matters within their personal knowledge. So, we must determine whether the affiant related sufficient facts in the Affidavit so that the magistrate could make an independent decision based on the credibility of the individuals supplying the information.

The amended statute IC 1971, 35-1-6-2, Ind. Ann. Stat. § 9-602 (Burns Supp. 1973), provides that an affidavit may be based on credible hearsay and it must contain "(c) the facts within the affiant's knowledge as to the credibility of the credible person".

The reasons for credibility of each of the informants was meticulously detailed in Sergeant Allen's Affidavit. As to the professional informants involved—Captain Ray Thompson of the Indiana State Police Laboratory, Dr. James A. Benz, pathologist of Marion County General Hospital, and John Linehan, private investigator and former Chief of Detectives of the Marion County Sheriff's Department—the Affidavit recited that the affiant believed in their credibility by virtue of long association with them or knowledge of their general reputation as professional persons, or both.

The results of a polygraph test established the element of credibility of Pernie Foxworthy, a long-time close personal friend of Landers. Frances Havley, Mabel Risk, Carson Shepherd, Richard Waggoner, and Dorothy and Danny Burnett were held out as credible persons because of their demeanor, their relationship to Landers, and the corroborative effect of their information.

Ronald Gooley was found to be credible because two important aspects of his statement were verified by third persons who had dealt with him and Landers in connection with the renting of the circular saw and the purchase of a trash barrel.

If the issuing magistrate must have the facts within the affiant's knowledge as to the credibility of the persons supply-

ing the information forming the basis of the search warrant, how is that credibility to be supplied?

In *Riddle* v. *State* (1971), 257 Ind. 101, 275 N.E.2d 788, the victim of a robbery was found to supply credible hearsay, the court saying:

> "The affidavit states that Mr. Hogan (1) called the police, (2) informed the police about the robbery, (3) entered a police car to assist the police in their investigation, and (4) identified his assailant on the street within twenty minutes of the crime. *These facts before the magistrate while not independent indicia of reliability, are enough to justify his inference that the hearsay source was credible in this instance.*" (Emphasis supplied.) 275 N.E.2d at 793. *See also, United States* v. *Gardner* (7th Circuit, 1971) 448 F.2d 617.

The requisite credibility of the hearsay sources in the Affidavit seems to be as well established by the highly corroborative nature of the information supplied, the professional standing of some of the informants, and the particular relationship between the informants and Landers, as was true of the victim of a robbery in *Riddle.* As the Court said in *United States* v. *Hood* (7th Circuit, 1970), 422 F.2d 737:

> "The informant's reliability was further strengthened by the hearsay information furnished by the other two informants since their statements tended to corroborate the hearsay supplied by the first informant. In Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964), the Supreme Court sustained a finding of probable cause based upon an affidavit containing interrelated hearsay information from a number of undisclosed informants." 422 F.2d at 739.

Justifiable inferences that the hearsay sources were credible undergirded Sergeant Allen's Affidavit. *Riddle* v. *State, supra,* and *United States* v. *Hood, supra.*

So the combination of the standing and professional reputation of some of the informants, the corroborative effect of the statements, the observation of the demeanor of some of the informants by Sergeant Allen, the results of a polygraph test as to one informant and the

consistency of the physical facts with the statements made convince us that sufficient indicia of credibility of the informants was supplied in the Affidavit for the magistrate to make a probable cause determination based on credible hearsay.

There is no credibility gap in this case as was true in *Aguilar* v. *State of Texas* (1964), 378 U.S. 108, 84 S.Ct. 1509 (an unidentified informant), *Spinelli* v. *United States* (1969) 393 U.S. 410, 89 S.Ct. 584, and the recent Indiana Supreme Court case of *Madden* v. *State of Indiana* (1975), 263 Ind. 223, 328 N.E.2d 727.

## ISSUE TWO

Was Landers denied due process of law because of a substitution of an alternate juror during the course of the trial over her objection?

## ADDITIONAL FACTS

During the course of the trial, it was brought to the attention of the court that Landers had been seen having a conversation with Juror No. 2 during a recess.

The trial court immediately conducted a hearing to determine the nature of this incident. The juror, a teacher at Tech High School in Indianapolis, admitted speaking with Landers during the recess, at which time Landers had introduced her daughter who had attended Tech High School and a brief discussion ensued between the juror and the daughter, but no details of the case were discussed.

The State then moved that Juror No. 2 be dismissed and the court sustained the motion. Landers then moved for a mistrial on the grounds that a juror can only be removed upon a showing of misconduct and that Landers' constitutional rights to an impartial jury were adversely affected by installing the alternate juror.

Landers further contends that she had a right for the original jury to deliberate on her case and that there was no evidence that Juror No. 2 was in any manner prejudiced by the

incident and that, by removal of this juror, Landers became prejudiced in the eyes of the eleven remaining jurors.

The State replies that the defendant's right is to an impartial jury—not to a jury of her choice and that a bond had been established between Landers' daughter and Juror No. 2.

## DECISION

CONCLUSION—Landers was not denied due process of law by the substitution of an alternate juror.

Landers' right is to a jury composed of impartial jurors, and to secure that impartiality Trial Rule 47 (B) provides for the calling and impanelling of alternate jurors to replace regular jurors who are unable or disqualified from performing their duties during the course of the trial. Alternate jurors are selected in the same manner as regular jurors, have the same qualifications, are subject to the same examination and challenges, and take the same oath and are prepared at all times to replace a regular juror. *See Turczi* v. *State* (1973), 261 Ind. 273, 301 N.E.2d 752. Thus, both regular jurors and alternate jurors are purified by the same process and the integrity of the jury is maintained whether a regular or an alternate juror serves on the jury during the course of the trial.

Replacement of a regular juror with an alternate juror is left to the discretion of a trial court and is not subject to statutory guidelines. 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2484, p. 476; *Shack* v. *State* (1972), 259 Ind. 450, 288 N.E.2d 155, 163.

In the exercise of its discretion the trial court apparently saw a danger that Juror No. 2 had been cultivated by Landers through her daughter and his impartiality subject to doubt.

Landers has in no way demonstrated how she was prejudiced by the substitution of jurors and her argument is subject to the interpretation that she is entitled to a jury of her choice rather than an impartial one.

Landers cites no applicable authority and makes no cogent argument that a juror can only be removed upon a showing of misconduct.

Under these circumstances the trial court did not abuse its discretion in granting the State's motion and overruling Landers' motion for a mistrial.

ISSUE THREE

> Was Landers denied a fair trial because of the admission into evidence of gruesome photographs?

Landers contends that the admission into evidence of these four gruesome photograph (Exhibits 10, 11, 12 and 18) was for the purpose of inflaming the minds of the jury against Landers and that these photographs representing parts of Robinson's dismembered body were not relevant in that they did not tend to prove or disprove any material fact in the case, as Robinson died of gunshot wounds.

The State's response is that admission into evidence of these exhibits showing parts of the victim's body tended to prove guilt because dismemberment was part of the modus operandi of the crime.

## ADDITIONAL FACTS

State's Exhibits 10, 11, 12 and 18 are photographs of parts of Robinson's dismembered body. Exhibit No. 10 is a photograph of the upper severed portion of the body taken during the autopsy. State's Exhibit No. 11 depicts a sawed femur bone also taken during the autopsy. State's Exhibit No. 12 is a photograph of the end of the femur toward the knee joint showing several incized wounds in the cartilage of the knee at the distal end of the femur. State's Exhibit No. 18 is a photograph depicting the lower portion of Robinson's body held in close proximity to the left chest wall showing that the two pieces roughly fit together.

## DECISION

CONCLUSION—The photographs of parts of Robinson's dismembered body (Exhibits 10, 11, 12 and 18) were properly admitted into evidence.

Photographs of a decedent's dismembered torso and severed limbs were found to have been properly admitted into evidence in *Schmidt* v. *State* (1970), 255 Ind. 443, 265 N.E.2d 219, because there was evidence that the defendant and her lover had planned to dismember the body in order to facilitate its removal from the premises. As Justice Givan said in that case, "One can hardly expect such a picture to be other than gruesome. This does not mean it was inadmissible."

Prejudice occurs not because of the gruesome character of the photograph but because the photograph is not material or relevant or does not "shed any light on any issue" *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N.E.2d 899. *Also see, Patterson* v. *State* (1975), 263 Ind. 55, 324 N.E.2d 482; *Cambron* v. *State* (1975), 262 Ind. 660, 322 N.E.2d 712; *Sexton* v. *State* (1974), 262 Ind. 554, 319 N.E.2d 829; *Hubbard* v. *State* (1974), 262 Ind. 176, 313 N.E.2d 346.

*Schmidt* v. *State, supra,* governs disposition of this issue. While State's Exhibits 10, 11, 12 and 18 were of little value as to identifying Robinson, they were relevant in that they tended to circumstantially prove that Landers did in fact kill Robinson according to a prearranged plan of dismemberment. Landers had stated that if anyone needed to get rid of a body she knew how. She rented a circular power saw and there was testimony that a saw of some kind had been used to dismember Robinson's body and this fact was illustrated by the photographs. Also she had purchased a trash barrel and burned a bloody bundle therein.

Thus, these photographs tended to be relevant in circumstantially linking Landers to the killing of Robinson through the act of dismemberment. Gruesome though they may have been, they tended to point the finger of guilt at Landers.

## ISSUE FOUR

Was a box of .22 calibre bullets seized in a search of Landers' residence properly admitted into evidence, even though this specific item was not named in the search warrant or on the return to the search warrant until the day of trial?

Landers contends that the warrant read "a .22 calibre firearm or firearms and spent .22 calibre casings or slugs, metal fragments and shavings", and what was seized was a box of *unused* .22 calibre slugs . . . and so were not within the scope of the warrant. She also contends that as this box of bullets was not listed on the original return on the search warrant but on an amended return filed on the morning of the trial, she was denied the opportunity to challenge the admissibility of the bullets in evidence.

## ADDITIONAL FACTS

An unused box of .22 calibre bullets was found in the course of the search of Landers' house in a purse on a chest in a storage room in a far corner of the house. The search warrant specified "spent .22 calibre casings or slugs".

Landers objected to the return of the warrant being amended on the first day of trial to show the existence of the box of bullets and moved to suppress the evidence on the ground that no opportunity had been given to challenge the admissibility of this box of bullets. After hearing argument, the court inquired whether any additional or different evidence would be presented if a further hearing were to be held on the Motion to Suppress at a later time. Receiving a negative response, the trial court overruled the Motion to Suppress.

No continuance was sought by Landers, who was aware of the existence of the bullets prior to trial and apparently had examined them.

## DECISION

CONCLUSION—The box of bullets was properly admitted into evidence and the Motion to Suppress was properly overruled.

*United States* v. *Robinson* (N.D. Ind. 1968), 287 F.Supp. 245, establishes the principle that instruments of a crime which are seized pursuant to a valid search warrant ■ which does not list such instruments are admissible into evidence:

> "The only reasonable rule, the one which this Court adopts, is that officers conducting a lawful search pursuant to a search warrant *may seize any fruits, instruments or evidence of crime which they might uncover."* (Emphasis supplied.)

*Also see,*

> *Hall* v. *State* (1971), 255 Ind. 606, 266 N.E.2d 16 (quotes and relies on *United States* v. *Robinson, supra*) ; 79 C.J.S., Searches and Seizures, § 83.

First of all, we do not necessarily agree with Landers that the unspent .22 calibre bullets were not within the scope of the warrant which specified ".22 calibre firearms or firearms and spent .22 calibre casings or slugs. . . ." Slugs and casings for use in .22 calibre firearms were the object of the search. But even if presumed not to be specified as such, the box of bullets was so closely related as to be properly admissible in evidence as a related instrumentality found in the search. 79 C.J.S., Searches and Seizures, § 83, and *Hall* v. *State, supra; United States* v. *Robinson, supra.*

While the return to the search warrant was amended on the day of trial to include the box of bullets (a ministerial act), Landers' counsel was offered and refused the opportunity of a further hearing on his Motion to Suppress if he could assure the court that the evidence would differ from the previous hearing in which his only argument was that the box of bullets were not listed in the warrant.

No request was made for a continuance nor is there any showing of prejudice to Landers . . . nor any citation of

authority in support of her position. Under these circumstances we can find no reversible error.

ISSUE FIVE

Was the evidence sufficient to support Landers' conviction of Voluntary Manslaughter?

DECISION

CONCLUSION—The evidence was sufficient to support Landers' conviction of Voluntary Manslaughter.

Initially, we recognize the long-standing principle that manslaughter has been treated as a lesser included offense of murder in Indiana. *Robinson* v. *State* (1974), Ind. App. 309 N.E.2d 833, rev'd on other grounds, 262 Ind. 463, 317 N.E.2d 850; *Barker* v. *State* (1957), 238 Ind. 271, 150 N.E.2d 680; *Mimms* v. *State* (1967), 249 Ind. 168, 231 N.E.2d 151; *Gatchett* v. *State* (1973), 261 Ind. 109, 300 N.E.2d 665.

The rule from these cases is that if there is evidence which would support a conviction for murder in either degree, then the jury has a right to find the defendant guilty of Voluntary or Involuntary Manslaughter as a lesser included offense even in the absence of proof of "sudden heat." *Fraley* v. *State* (1974), 163 Ind. App. 226, 323 N.E.2d 239.

All the circumstantial evidence against Landers need not be recited for us to conclude that there was strong circumstantial evidence supporting her conviction.

Landers and Robinson had frequent altercations which at times resulted in physical violence to her. She made repeated threats to kill him and purchased a .22 calibre revolver. She indicated a preconceived plan to dispose of a corpse by dismemberment. She purchased a saw and a trash barrel shortly after he was last seen with her.

About the same time she burned a bloody bundle in the purchased barrel and parts of Robinson's dismembered body were found at different geographic locations, the head containing two .22 calibre slugs.

She stated to a friend, after Robinson's disappearance, that she had already taken care of him and showed a friend a cement sack in the basement where she had previously test fired a .22 calibre revolver.

A search of her home revealed numerous items covered with human blood, one being Type O which matched the blood found in Robinson's torso. Shortly after his disappearance, she returned a bundle of his clothes to his home.

The circumstantial evidence supporting Landers' conviction is strong enough to support a reasonable inference of guilt beyond a reasonable doubt. *McAfee* v. *State* (1973), 259 Ind. 687, 291 N.E.2d 554; *Guyton* v. *State* (1973), 157 Ind. App. 59, 299 N.E.2d 233; *Burton* v. *State* (1973), 260 Ind. 94, 292 N.E.2d 790; *Coach* v. *State* (1968), 250 Ind. 226, 235 N.E.2d 493; *Arrington* v. *State* (1952), 230 Ind. 384, 103 N.E.2d 210; *Mandich* v. *State* (1946), 224 Ind. 209, 66 N.E.2d 69; *Henry* v. *State* (1925), 196 Ind. 14, 146 N.E. 822; *Osburn* v. *State* (1905), 164 Ind. 262, 73 N.E. 601; *White* v. *State* (1948), 226 Ind. 309, 79 N.E.2d 771; *Farno* v. *State* (1974), 159 Ind. App. 627, 308 N.E.2d 724.

The trial court's judgment is affirmed.

Sullivan, P.J. and White, J., concur.

NOTE.—Reported at 331 N.E.2d 770.