**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**ERIC KOSELKE**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DONALD WORTH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1312-CR-1065 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt Eisgruber, Judge
Cause No. 49G01-1212-FA-86791

**October 2, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Donald Worth (Worth), appeals his conviction for rape, a Class A felony, Ind. Code § 35-42-4-1; battery, a Class B felony, I.C. § 35-42-1-1(a)(3); and criminal confinement, a Class D felony, I.C. § 35-42-3-3.

We affirm.

## ISSUES

Worth raises two issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by replacing a juror, who had failed to disclose information about a relative's pending criminal charges in the same county, after the jury was sworn but before deliberations; and

(2) Whether the trial court abused its discretion by excluding evidence of an unknown male contributor to a DNA profile derived from the victim's external genital swab.

## FACTS AND PROCEDURAL HISTORY

On December 28, 2012, K.S. lived with Michelle Robinson (Robinson), her Narcotics Anonymous sponsor, in Indianapolis, Indiana. That afternoon, K.S. left the apartment with a male friend to go to the grocery store. They had a couple of drinks before K.S. returned to Robinson's apartment. While there, K.S. contacted Worth and asked him to pick her up so they could go to a bar. K.S. had known Worth approximately six months and referred to him as "Teddy Bear." (Transcript p. 194). Robinson did not "get a good feeling about [Worth]" so K.S. told her that she was going to be picked up by her brother. (Tr. p. 195). After leaving the apartment, K.S. and Worth went to Mike's

Speedway Lounge, where they consumed several alcoholic beverages. After Worth paid the bill, K.S. and Worth went to Worth's apartment "right around the corner" because he was "too drunk" to drive K.S. back to Robinson's apartment. (Tr. p. 197). K.S. fell asleep on the couch while Worth slept in his bed.

The next morning, at approximately 11:00 a.m., K.S. and Worth purchased food from a McDonald's restaurant and vodka from a liquor store. They returned to Worth's apartment where they ate, drank, and watched television for several hours. K.S. asked if they could get something more to eat "to soak up the alcohol in our stomach," but Worth refused. (Tr. p. 202). When K.S. again asked Worth to get something to eat, Worth became "irritated" and "things just turned violent." (Tr. p. 204). Worth hit K.S. in the left eye with his "closed fist" and then wrapped his hand around K.S.'s hair and threw her to the ground. (Tr. p. 205). K.S. curled herself into a ball on the floor while Worth repeatedly kicked her in the face with his work boots, yelling, "Fuck you, bitch. Fuck you, bitch." (Tr. pp. 206, 207). K.S. lost consciousness. When she awoke, she was in Worth's bed. Her pants had been removed and Worth was on top of her with his penis in her vagina. K.S. screamed "to get the fuck off [her]." (Tr. p. 208). Worth hit K.S.'s head against the wall while yelling profanities. She drifted in and out of consciousness as Worth continued to have intercourse with her. She heard Worth exclaim, "I'm coming, I'm coming;" he pulled his penis out and "[went] back to sleep." (Tr. pp. 209-10).

When they both awoke the following morning, K.S. told Worth, "You beat the crap out of me," but Worth denied this and instead told K.S. "You were drunk. You were falling all over the place." (Tr. pp. 211-12). Worth told K.S. to call Robinson and tell

3

Robinson that "Worth didn't beat [her] up." (Tr. p. 213). K.S. called but was unable to give Robinson Worth's address because he refused to give K.S. this information. After the phone call, Worth and Robinson returned to Mike's Speedway Lounge where the bartender observed that K.S.'s whole entire face was swollen "like [] a softball" and her injuries were "very noticeable." (Tr. pp. 304, 317). K.S. repeated several times, "He did not do this to me. He is a very nice man." (Tr. p. 305). Eventually, K.S. called Robinson from the bar to pick her up. When Robinson arrived, she noticed that K.S. looked "scared" and her "face was disfigured." (Tr. p. 270). Robinson immediately took K.S. to Methodist Hospital.

At Methodist, Joyce Fuss (Nurse Fuss), a registered nurse and forensic nurse examiner, documented K.S.'s injuries, which included a softball-sized swelling to the left cheek, bruising under K.S.'s left eye, a round bruise to the left of K.S.'s trachea, and bruising to K.S.'s knees. Nurse Fuss also observed a laceration to K.S.'s vagina that required stitches, as well as vaginal abrasions indicative of a sexual assault. Nurse Fuss also collected a blood standard and swabs from K.S., as well as from her blue jeans. Subsequently, K.S. had to undergo surgery to drain the blood and fluids from the hematoma and a dental procedure to shave the bone underneath her gums.

Officer Laura Smith of the Indianapolis Metropolitan Police Department (Officer Smith) met K.S. at the Methodist emergency room and gathered information about Worth. When Officer Smith, together with other officers, met Worth at his apartment, Worth yelled, "Fuck you, motherfuckers," and had to be assisted to the patrol car. (Tr. p. 636). He was transported to Officer Smith's office in handcuffs. During two searches of

4

Worth's apartment, officers collected a bed sheet off Worth's bed, a bloody washcloth, Worth's work boots, his cell phone, and K.S.'s cell phone.

On January 2, 2013, the State filed an Information charging Worth with Count I, rape, a Class A felony, I.C. § 35-42-4-1; Count II, rape, a Class B felony, I.C. § 35-42-4-1; Count III, battery, a Class C felony, I.C. §35-42-2-1(a)(3); Count IV, criminal confinement, a Class D felony, I.C. § 35-42-3-3; Count V, criminal confinement, a Class D felony, I.C. § 35-42-3-3; and Count VI, battery, a Class A misdemeanor, I.C. § 35-42-2-1(a)(1). On November 18 through November 20, 2013, a jury trial was conducted. During voir dire, Worth's counsel challenged for cause a prospective juror who had been a rape victim. The trial court denied the challenge, and because Worth did not peremptorily strike her, the juror became the first alternate.

After the jury was sworn, one of the jurors, Juror Cook, disclosed to the bailiff that his brother had pending child molesting charges in the same county. The trial court questioned Juror Cook, who stated that he "forgot all about" disclosing it on his questionnaire because he never talked to his brother. (Tr. p. 158). Juror Cook stated that he felt his brother had been wrongly accused: "He was getting ready to go to court, divorce court. He was trying to get the child and the house. His wife owns an art gallery and her father is pretty rich -. . . - and they made up allegations just to get the child." (Tr. p. 160). Inquiring whether Juror Cook would hold this against the State as it seemed "upsetting to" him," the Juror replied, "It is. He's my brother, of course." (Tr. p. 160). However, Juror Cook also affirmed that he could be fair and impartial, listen to the evidence, and render a determination based on the evidence. Nevertheless, the trial court

5

removed the Juror and the first alternate juror was impaneled. Following the presentation of the evidence, the jury found Worth guilty as charged.

On December 6, 2013, the trial court conducted a sentencing hearing. During the hearing, the trial court merged Counts II, III, and IV into Count I, rape as a Class A felony. The court imposed fifty years imprisonment with ten years suspended to probation for the Class A felony rape, four years executed for Class C felony battery, and one and one-half years executed for Class D felony criminal confinement. The trial court ordered the sentences to run concurrently.

Worth now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Removal of Juror*

Worth contends that the trial court abused its discretion by removing Juror Cook from the venire after the jury was sworn. He maintains that the removal effectively resulted in the State exercising a peremptory challenge after the jury was impaneled.

A juror cannot be challenged peremptorily after the jury is sworn. *See Stevens v. State*, 357 N.E.2d 245, 246 (Ind. 1976). Rather, the removal of a juror after the jury is sworn falls within the purview of Indiana Trial Rule 47(B), which states, in pertinent part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have significant leeway under Indiana Trial Rule 47(B) in determining whether to replace a juror with an alternate and we will reverse

if there was an abuse of discretion. *Jervis v. State*, 679 N.E.2d 875, 881 (Ind. 1997). An abuse of discretion occurs only if the decision placed the defendant in substantial peril. *Woolston v. State*, 453 N.E.2d 965, 968 (Ind. 1983). We defer substantially to trial judges on this point because they see jurors firsthand and are in a much better position to assess a juror's ability to serve without bias or intimidation and decide the case according to law. *Jervis*, 679 N.E.2d at 881. A biased juror must be dismissed. *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). However, a defendant is entitled as a matter of right only to an impartial jury, and not to one of his precise choosing where the issue is merely replacing a regular juror with an alternate. *Whitehead v. State*, 500 N.E.2d 149, 153 (Ind. 1986). Indeed, alternate jurors are presumed to be fair and equally qualified to the task. *French v. State*, 521 N.E.2d 346, 349 (Ind. 1988).

Here, after the jury was sworn and prior to opening arguments, Juror Cook brought to the bailiff's attention that he had omitted certain information from his jury questionnaire. Outside the presence of the other jurors, the trial court questioned the Juror. During questioning, Juror Cook divulged that he had failed to disclose that his brother is facing pending child molestation allegations in the same county. He explained that he had forgotten all about it because he "never talk[ed]" to his brother. (Tr. p. 158). Juror Cook stated that he felt his brother was wrongly accused during the course of his divorce proceeding and expressed that he was upset by the State filing charges against his brother.

Upon confirming that Juror Cook's brother had a pending case in the jurisdiction, the State, outside the presence of Juror Cook, acknowledged that the Juror is not "a for

7

cause challenge" but citing grave concerns as to his ability to be fair and impartial, requested the trial court to strike Juror Cook. (Tr. p. 162). Focusing on Juror Cook's assertion that despite his brother's pending allegations, he could still be fair and impartial in the instant proceedings, Worth's defense counsel objected to his removal from the panel. Moreover, the defense pointed out that its strategic decisions to use its allotted strikes were based on its anticipation on how the State was using its strikes. "If [the defense] had known [the State was] going to strike him, knowing how many other strikes they had left, [the defense] probably would have retained a strike because [it] [knew] that the fourth person on the next panel [was] a victim of violent crime herself." (Tr. p. 166). This fourth person ultimately became the first alternative juror.

> The trial court concluded that:
>
> It's information that's come to light, unfortunately, after we've sworn a jury, and then we have to deal with – deal with it as it arises. And our example is good, the State's example. If we call a witness who someone knows, they recognize them when they walk in here, they alert the bailiff, we have to address it at that moment. They could have recognized the name when we read off the names, but they didn't; they only recognized him on site, and we have to deal with the realtime situation. That's how I view this.
>
> And to be perfectly candid, I think really the elephant in the room is your concern is the first alternate becoming a juror. And I understand that, but I think she's a good juror. So I will strike [Juror] Cook for the reason stated.

(Tr. pp. 168-69).

Thus, despite Juror Cook's claim to the contrary, the trial court inferred bias from the nature of the Juror's responses and his family's experience with the prosecutor's office. Removal of a biased juror is proper regardless of which way the bias cuts. *See*

8

*Landers v. State*, 331 N.E.2d 770, 777 (Ind. Ct. App. 1997). Mindful of our substantial deference to the trial court, we cannot conclude that the trial court abused its discretion in removing him from the venire.

Furthermore, removing Juror Cook and replacing him with the first alternate juror did not place Worth in substantial peril. Worth had participated in the voir dire of the alternate juror and there is no evidence that the alternate juror harbored a bias against either party. In fact, the trial court remarked that

> I know the juror you speak of, who was voir dired and she was clearly not a strike for cause. She's had experience in life, but she indicated she could put that aside and make an adjudication based on the evidence. And if that changes, then it needs to be addressed, if she feels that way.

(Tr. p. 167). Because the trial court's decision to remove Juror Cook and replace him with the first alternate juror was reasonable, the court did not abuse its discretion.

## II. *Exclusion of Evidence*

Next, Worth contends that the trial court abused its discretion by excluding evidence of an unknown male contributor to the DNA profile recovered from K.S.'s external genital swab.

A trial court has broad discretion in ruling on the admissibility of evidence, and on review, we will disturb its ruling only on a showing of abuse of that broad discretion. *Sparkman v. State*, 722 N.E.2d 1259, 1262 (Ind. Ct. App. 2000). When reviewing a decision under this abuse of discretion standard, we will affirm the trial court's decision if there is any evidence supporting the decision. *Id*. A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is

affected. Ind. Evidence Rule 103(a). In determining whether error in the introduction of evidence affected a defendant's substantial rights, we assess the probable impact of the evidence on the jury. *Sparkman*, 722 N.E.2d at 1262. In addition, any error in the admission of evidence is harmless if there is substantial independent evidence upon which the jury could have convicted the defendant. *Dixon v. State*, 967 N.E.2d 1090, 1094 (Ind. Ct. App. 2012).

To be admissible at trial, the proffered evidence must be relevant, that is, it must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Evid. R. 401. Evidence that is not relevant must be excluded. Evid. R. 402. The admission of expert testimony about DNA evidence is governed by Evidence Rule 702, which provides as follows:

> (a) if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In the present case, Worth focuses on the expert testimony with respect to the DNA evidence related to K.S.'s external genital swab. At trial, the State presented the Laboratory Examination Report generated by Shannin Guy (Guy), a forensic scientist at the Indianapolis-Marion County Forensic Services Agency. With respect to the contested DNA evidence, the Report notes:

The DNA profile obtained from the sperm fraction of item 005.004.01 is a mixture with major and minor contributors. The DNA profile of the major contributor matches the DNA profile of [K.S.][]. The partial DNA profile of the minor contributor is inconclusive. [Worth][] is excluded as a contributor to the mixed sample.

(State's Exh. 71, p. 2). Explaining this result, Guy informed the jury that a partial DNA profile is developed when there is not sufficient information derived from the tested sample to compute either statistics or a profile. "And while it's inconclusive," the limited information can be used "to exclude people." (Tr. p. 521). "So if the numbers don't add up to someone, you can at least say that it's not them." (Tr. p. 521).

On cross-examination, Worth's counsel elicited the following information:

[DEFENSE COUNSEL]: [] Now I want to ask you about item 5.4.1, . . . the external genital swabs, right?

[GUY]: Yes.

[DEFENSE COUNSEL]: And your conclusion there is that – the sperm fraction, that matches the profile of K.S.?

[GUY]: The major contributor, yes.

[DEFENSE COUNSEL]: The major contributor. And there are – there's a minor contributor to that sample, is that correct?

[GUY]: A partial minor, yes.

[DEFENSE COUNSEL]: A partial minor. And when we say a "partial minor," we're talking about actual DNA?

[GUY]: Yes.

[DEFENSE COUNSEL]: So somebody's DNA besides K.S. is in the sample collected from her external vaginal swab?

[GUY]: Yes.

11

[DEFENSE COUNSEL]: And that person we know is not [Worth]?

[GUY]: That's correct.

[DEFENSE COUNSEL]: And I have one more question about that particular sample. You're not calling that an unknown male, correct?

[GUY]: No, I'm not.

[DEFENSE COUNSEL]: Because on the scan, you don't see the Y chromosome?

(Tr. pp. 556-58). The State objected. Outside the presence of the jury, Worth's counsel made the following offer of proof:

[DEFENSE COUNSEL]: So your quantitation [sic] on item 4.5.1 [sic], sperm fraction, shows there is male DNA?

[GUY]: Yes. It indicates, but it's also at a very low level, and it's also below or [sic] detection limit from our standard curve.

[DEFENSE COUNSEL]: Right. But there is male DNA?

[GUY]: Very low, three picograms.

(Tr. p. 580).

As recognized by both parties, Indiana's seminal case with respect to the admission of DNA evidence is *Deloney v. State*, 938 N.E.2d 724 (Ind. Ct. App. 2010), *reh'g denied, trans. denied*. In *Deloney*, the DNA expert testified that she could not exclude Deloney or his co-conspirator as one of the people who deposited DNA on the red hat, but neither could she include them, as "there was just not enough information." *Id*. at 729. She further testified that she could not calculate the statistical significance of any matches between Deloney's profile and the DNA profiles found on the hat because the mixed sample did not allow for statistical analysis[.]" *Id*. Acknowledging the

12

existence of three different approaches in the case law, the *Deloney* court focused on the line of precedents which required "accompanying statistical data for DNA evidence to be admissible" as comporting best with our "existing law regarding admissibility of evidence." *Id*. In other words, "[w]ithout statistical data, evidence of a non-match is meaningless, and does not assist the trier of fact in determining the guilt or innocence of the defendant, as required for the admissibility of the DNA evidence under Evid. R. 401 and expert testimony thereon under Evid. R. 702." *Id*. at 730. As such, the court ruled, "Therefore DNA evidence that does not constitute a match or is not accompanied by statistical data regarding the probability of a defendant's contribution to a mixed sample is not relevant [] and should be excluded." *Id*.

Turning to the profile of the minor contributor in the contested DNA profile of K.S.'s external genital swab, we conclude that the trial court properly excluded the allegations of this minor contributor as an unknown male B. In her testimony, Guy admitted to being unable to give any statistical analysis of the probability of a match. Although testimony about her exclusion of Worth as a possible match was admissible, any testimony about the inconsistent result of the minor contributor could not assist the jury in understanding the evidence or make the evidence of some fact more or less probable. *See id*. As such, we affirm the trial court's exclusion of the evidence.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion when it replaced a juror after the jury was sworn but before deliberations; and the trial

court properly excluded evidence of an unknown male contributor to a DNA profile recovered from the victim's external genital swab.

Affirmed.

MATHIAS, J. concurs

CRONE, J. concurs in result with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

DONALD WORTH,                                )
                                             )
    Appellant-Defendant,          )
                                             )
        vs.              )      No. 49A02-1312-CR-1065
                                             )
STATE OF INDIANA,                            )
                                             )
    Appellee-Plaintiff.           )

**CRONE, Judge, concurring in part and concurring in result in part**

I fully concur with the majority's determination that the trial court did not abuse its discretion in replacing Juror Cook. As for its determination that the trial court did not abuse its discretion in excluding evidence that an unknown male contributed to the DNA profile of the sperm fraction recovered from K.S.'s external genital swab, I respectfully concur in result.

Unlike the majority, I do not believe that *Deloney* supports the exclusion of that evidence here. Worth was excluded as a contributor to the profile, and he was not seeking to match the profile of the unknown contributor to anyone. Instead, he was

seeking to establish that someone else had sexual intercourse with K.S., and evidence that the unknown contributor was a male would be probative of that fact. *Deloney* may well be the seminal case in this area, as the majority suggests, but I find it inapplicable in this instance. It is not necessary to identify the source of the DNA in order to support the proposition that someone other than Worth had visited the area, and that was relevant to Worth's defense.

In light of all this, did the trial court abuse its discretion in excluding evidence that the unknown contributor was a male? Although the quantum of that evidence was vanishingly small, it was probative of and therefore relevant to Worth's defense that someone else had sexual intercourse with K.S.[1] Consequently, I would hold that the trial court abused its discretion in excluding it. *Cf. Wilson v. State*, 4 N.E.3d 670, 675 (Ind. Ct. App. 2014) ("In general, all relevant evidence is admissible.") (citing Ind. Evidence Rule 402), *trans. denied*.

Nevertheless, "errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact." *Hyser v. State*, 996 N.E.2d 443, 448 (Ind. Ct. App. 2013) (citation omitted). Given that the jury heard evidence that DNA from an unknown male was present in the sperm fraction obtained from the crotch of K.S.'s jeans, that DNA from an unknown third person was present in

---

[1] K.S. testified that she had sexual intercourse with someone other than Worth "maybe two weeks or so" before her encounter with Worth. Tr. at 233.

the sperm fraction obtained from her external genitalia, and that Worth was excluded as a contributor to both samples, I would find the trial court's error harmless. The jury obviously credited K.S.'s testimony that Worth raped her, notwithstanding the absence of corroborating DNA evidence and the presence of a third person's DNA on and near her external genitalia, and therefore I do not believe that the excluded evidence would have had an appreciable impact on the jury.