Dale Lee MILAM, Plaintiff-Respondent,

v.

Michael Rex VESTAL,
Defendant-Appellant.

No. 13048.

Missouri Court of Appeals
Southern District,
Division Two.

May 18, 1984.

Jerry L. Reynolds, Springfield, for defendant-appellant.

Robert T. Beezley, Springfield, for plaintiff-respondent.

HOGAN, Judge.

This is a personal injury action which arose out of a collision between two vehicles. As plaintiff Dale Milam was driving to work about 6:45 a.m. on October 3, 1979, her automobile was struck from the rear by another automobile being driven by defendant Michael Vestal. Thomas Ray Milam, plaintiff's husband, initially sought re-

covery for loss of services, or consortium, but that count of the petition was voluntarily dismissed before trial. A jury found for the plaintiff and against defendant in the amount of $15,000. Defendant appeals, contending: 1) that the trial court erred in substituting an alternate juror without cause; 2) that there was no evidentiary support for Instruction No. 7, given at plaintiff's request, because there was no evidence "to support a future damage instruction," and 3) the court erred in denying defendant's alternative motion for new trial or for remittitur because the verdict was excessive. We affirm.

Instruction No. 7, as given to the jury, read as follows:

"If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe she sustained and is reasonably certain to sustain in the future as a direct result of the occurrence of October 3, 1979, mentioned in the evidence."

As noted, defendant argues that there was no substantial evidence plaintiff was reasonably certain to sustain any future damages as a result of the accident. We cannot agree.

█ In determining whether there was substantial evidence to support the giving of a particular instruction, this court must view the evidence in the light most favorable to the party tendering the instruction. *Pritt v. Terminal R.R. Ass'n of St. Louis,* 359 Mo. 896, 906, 224 S.W.2d 119, 124[9] (1949); *Carter v. Boy's Club of Greater Kansas City,* 552 S.W.2d 327, 333[12] (Mo. App.1977). The plaintiff sustained a low back injury. She consulted several physicians. Dr. Anita Isaac, a specialist in physical medicine and rehabilitation, testified that 30 to 40 percent of her practice consisted of treatment of patients with neck and back injuries, and that during the course of her professional career, she had treated all types of back injury, from those which were minor, lasting only a few weeks, to major fracture dislocations with complete spinal cord involvement.

The plaintiff first consulted Dr. Isaac on January 23, 1980. Plaintiff advised this physician that she had experienced pain in her back and neck after the accident, and that the neck pain was "pretty well gone" but her back pain was still quite severe. Dr. Isaac's clinical observation and the tests she performed at the time suggested a lumbosacral injury on the left side of plaintiff's body. Such an injury produces pain, muscle spasm and limitation of motion in the area affected. Dr. Isaac prescribed drugs, intermittent traction and other treatments between January 23 and November 4, 1980, but the plaintiff continued to suffer extreme, intermittent low back pain. Dr. Isaac finally concluded that plaintiff had sustained a prolapsed or ruptured spinal disc. In response to a long hypothetical question, Dr. Isaac testified she believed plaintiff's low back complaint was related to the accident and that plaintiff had sustained a permanent injury.

Plaintiff also had the testimony of Dr. Marion L. Wolf, a specialist in orthopedic surgery. Approximately 25 percent of this physician's practice consisted of treating patients with low back pain and low back problems. Dr. Wolf had first seen the plaintiff as a patient in 1977, at which time he removed a benign bone tumor from one of her legs. Dr. Wolf also saw the plaintiff on April 6, 1982, at which time plaintiff complained of radiating pain down the back of her left leg; plaintiff stated this pain was exacerbated by coughing, sneezing and particularly by lifting and doing housework. Dr. Wolf's examination led him to believe there was a possibility the plaintiff was suffering from lumbar disc disease. He explained the nature of that disease to the jury and with the aid of exhibits, explained why a ruptured or prolapsed spinal disc causes pain.

Dr. Wolf performed an x-ray examination of the plaintiff's back; his recollection was that the examination showed nothing abnormal. He then recommended that the plaintiff have a myelogram. Most commonly, a myelogram is performed by injecting a dye into the sac around the spinal

cord; the dye is opaque to x-rays and x-rays taken while the dye is in place display certain characteristics which indicate spinal abnormality or injury to a trained eye.

Plaintiff had a myelogram done. Upon examination of the myelogram, Dr. Wolf could detect no positive sign of a ruptured or prolapsed spinal disc, but he did not consider this conclusive because about 10 percent of those patients who suffer from extruded discs show no positive myelographic indication of their injury. In response to a long hypothetical question, stated and restated, Dr. Wolf gave as his opinion that plaintiff's injury was traumatic, was produced by the automobile accident, and that the plaintiff's pain and disability would continue for a significant period of time.

■ Plaintiff had other, similar medical evidence from a Dr. Claxton and the defendant produced an expert who gave it as his opinion that plaintiff had sustained no serious injury as a result of the collision, but a conflict in the opinion of medical experts is a matter for resolution by the triers of fact. Cf. *Richard B. Curnow, M.D., Inc. v. Sloan*, 625 S.W.2d 605, 607[4] (Mo. banc 1981). Plaintiff had substantial evidence that: a) she sustained an injury as a direct result of defendant's negligence; b) the injury was severe and such that it caused disabling, if intermittent pain in her lower back; c) her pain and disability had continued for nearly 3 years at trial time, and d) a major surgical procedure would likely be necessary to alleviate her intermittent pain and disability. Further, it is to be remembered that Dr. Isaac testified plaintiff had sustained a permanent injury.

■ We cordially agree with the defendant's argument that an instruction must be supported by the evidence, and this principle applies to the "future damage clause" in MAI 4.01. *Kramer v. May Lumber Company*, 432 S.W.2d 617, 621[4] (Mo.App. 1968). There is, however, a basic distinction between *future* damage, which was submitted by Instruction No. 7, and *permanent* damage; the terms are not synonymous. *Gaynor v. Horwitz*, 464

S.W.2d 537, 539[6, 7] (Mo.App.1971). "Future damages" is a term broad enough to include future pain and suffering and intermittent loss of ability to work and earn, and a showing of permanent injury is not essential to a hypothesis and submission of future damage. *Chaussard v. Kansas City Southern R. Co.*, 536 S.W.2d 822, 828–29[9] (Mo.App.1976); *Simmons v. Jones*, 361 S.W.2d 860, 862–63[3, 4] (Mo. App.1962). Further, long continuance of conditions existing at trial is sufficient to warrant giving an instruction on damages from future pain and suffering. *Jones v. Allen*, 473 S.W.2d 763, 766 (Mo.App.1971). Even setting aside Dr. Isaac's testimony that the plaintiff had a permanent injury, there was an evidentiary basis for the submission of future damages in this case.

■ The defendant further suggests that the hypothetical questions put to several physicians were improper, and plaintiff's proof of permanent damage was not substantial because one of plaintiff's hospital records reflect that plaintiff sustained a coccygeal fracture at some time in the past. The point is strained and tenuous.

Plaintiff testified that she was 24 years of age at the time of trial. She was born July 27, 1958. She had two children, was inferably managing a household and was working part-time prior to the accident. The hospital record to which defendant calls our attention is dated April 20, 1973, and refers to an injury plaintiff sustained 4 years earlier, by our calculation at some time in 1969. Plaintiff was therefore 11 years of age when this injury was sustained. The report itself states, as a matter of medical history:

> "Four years ago fell off slide hurting tailbone. ...."

The report indicates anteroposterior and lateral x-ray projections of the sacrum and coccyx "failed to reveal evidence of recent fracture or dislocation." It was the radiologist's "impression" nonetheless that because of the angulation of the coccygeal segments, the plaintiff had fractured her "tailbone" at some time in the past.

■ The plaintiff's testimony permitted the inference that she was leading a healthy, active life at the time the collision occurred. She had had other childhood injuries as well as the injury to her "tailbone." She had, in short, sustained minor injuries in childhood from which she had fully and completely recovered. As to the propriety of hypothetical questions which did not include the injury to plaintiff's tailbone at age 11, it is sufficient to say that a questioner may frame his hypothetical question on his own theory and need not necessarily include all of the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded tends to prove and fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue. *Huffman v. Terminal Railroad Ass'n of St. Louis,* 281 S.W.2d 863, 870 (Mo.1955); 2 H. Wigmore, Evidence § 682(b), p. 951 (Chadbourn rev.1979). As far as sufficiency is concerned, there is no evidence whatever that the "tailbone" injury caused or contributed to cause plaintiff's present condition. The point does not merit further discussion.

■ A further point most urgently advanced is that the trial court erred in excusing regular juror Houston and replacing him with an alternate before the jury began its deliberation.

The trial commenced on September 22, 1982. As permitted by § 494.065, RSMo (Supp.1983), an additional juror was called and impaneled to sit as an alternate. This additional juror was one Donaldson. On the second day of the trial, counsel for plaintiff approached the bench and advised the court that plaintiff's husband had overheard a conversation between three jurors. The conversation took place outside the courtroom. According to plaintiff's counsel, juror Houston said to two other jurors that he, Houston, did not know how a person could sustain a back injury from a rear-end collision. Plaintiff's counsel believed this indicated prejudgment and bias, undermined the fair and impartial constitu-

tion of the jury, and moved a mistrial. Defendant's counsel thought the incident indicated misconduct on Milam's part and asked that Milam be admonished to stay away from jurors during recesses.

The court promptly directed plaintiff's counsel to present what evidence he had. Being called and sworn, Milam testified he was in the hall during a recess in the voir dire examination. From 25 feet away, Milam had heard three veniremen conversing. Milam "... heard him talking about an accident, and [Houston] was saying that he [didn't] know how a person would get injured from an accident like that. And, he was indicating a movement forward-and-backward." These remarks and movements were made in the presence of two other jurors, who could not be identified by Milam. Juror Houston was sworn and could not remember making any such statement. The court put this question to juror Houston:

"So, you can come into court with an open mind, and listen to the evidence and make a decision based strictly on the evidence; is that correct? A. (by Mr. Houston) Um-hum (affirmative)."

The trial court thereupon announced it appeared to be the wisest course to proceed and the matter would be given further consideration before the jury began deliberation. At the close of the trial and before the jury began its deliberation, juror Houston was excused and replaced with alternate juror Donaldson. Upon voir dire, only part of which is before us, juror Donaldson indicated he had once had a claim for personal injury. He explained that "I filed a claim against an insurance company that paid the doctor bills and that was about all."

Pointing out that plaintiff had a nineman verdict and that the alternate was one of the nine who signed the verdict, defendant asserts prejudice in the substitution of Donaldson for Houston, maintaining there was no valid or substantial reason for Houston's removal. Upon development of the point, defendant states there appears to be a void of authority dealing with this

error. While we can readily understand able counsel's speculation that defendant might not have had a verdict if Donaldson had not replaced Houston, such a surmise does not constitute proof of error. The persuasive, though not controlling, precedents indicate that the substitution of an alternate juror for a regular juror is a matter entrusted to the discretion of the trial court. See *Metropolitan Paving Co. v. International Union of Operating Engineers*, 439 F.2d 300, 304–5 (10th Cir. 1971), cert. denied 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58 (1971) (construing F.R.Cv.P. 47(b); facts much similar to facts in the case at hand); *Cisneros v. Cities Service Oil Company*, 334 F.2d 232 (2d Cir.1964) (juror indicated he had taken a course from defendant's medical expert and had purchased one of the expert's books; refusal to remove held not abuse of discretion); *Landers v. State*, 165 Ind.App. 221, 331 N.E.2d 770, 777[5] (1975) (construing rule similar to § 494.065; replacement of regular juror with alternate held discretionary where trial court perceives possibility of prejudice); 9 C. Wright and A. Miller § 2484, p. 476 (1971) (replacement discretionary). In this case the record shows that the juror was removed because his reported remarks suggested a possible bias. The fact that the trial court deferred its ruling does not show an abuse of discretion. The point is without merit.

 Finally, the defendant asserts that the verdict was excessive and this court should order a remittitur. Although we have seen and examined scholarly attempts to quantify the value of pain and disability as items of damages,[1] we find them profoundly unconvincing. We also point out that we may not *compel* a remittitur; we may only order a party plaintiff to remit or face the trouble and expense of a new trial. *Carver v. Missouri-Kansas-Texas R. Co.*, 362 Mo. 897, 916–17, 245 S.W.2d 96, 105–6[25–29] (1952). All the considerations which are taken into account in deciding whether to exercise the power of remittitur were long ago stated by this court in *Turner v. Yellow Cab Company of Springfield*, 361 S.W.2d 149, 157–58 (Mo. App.1962), and have since been reiterated more authoritatively. *Hart v. City of Butler*, 393 S.W.2d 568, 580–81[19–22] (Mo. 1965). We have no reason to believe the law has changed or requires restatement. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945–46 (Mo.App.1978). Upon review of the record in light of the authority cited, we cannot say the verdict was excessive.

We find no error in any respect briefed or argued here; accordingly, the judgment is affirmed.

MAUS, P.J., and PREWITT, J., concur.

---

1. See, e.g., Peck, Compensation for Pain: A Reappraisal in Light of New Medical Evidence, 72 Mich.L.Rev. 1355 (1974).