**Vera RUST, Respondent,**

v.

**John Q. HAMMONS, et al., Appellant.**

**No. WD 51467.**

Missouri Court of Appeals,
Western District.

July 23, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 27, 1996.

Application to Transfer Denied
Oct. 22, 1996.

Michael A. Dallmeyer, Jefferson City, for appellant.

J. Christopher Spangler, Sedalia, for respondent.

Before LAURA DENVIR STITH, P.J., and ULRICH and SMART, JJ.

SMART, Judge.

John Q. Hammons is the owner of the Capitol Plaza Hotel in Jefferson City, Missouri. On the evening of July 20, 1992, the parking garage of the Capitol Plaza flooded. Vera Rust's car was damaged in the flood. Ms. Rust sued the hotel, contending that the hotel was negligent in failing to warn her that the garage was susceptible to flooding, and that the hotel failed to shut the "flood doors" on the garage in time to keep the garage from flooding. After a jury trial, Rust was awarded $5,259.62 in total damages. Hammons appeals, claiming that the trial court erred: (1) by allowing Rust to introduce Exhibit 13, a flood warning sign placed at the garage after the flood, because it was inadmissible evidence of subsequent remedial measures; (2) by refusing to admit expert opinion as to the time lapse between the water cresting the berm (a mound or wall of earth) separating the hotel from the building next door and the water reaching the entrance to the parking garage; (3) by submitting Instructions 6, 7, and 8 to the jury because there was no evidence proving facts essential to a failure to warn theory; and (4) by overruling his motion to join State Farm Mutual Insurance Company ("State Farm") as an additional party pursuant to Rule 52.04 or to dismiss because State Farm has an interest in this suit. The judgment of the trial court is affirmed.

When the Capitol Plaza was under construction in 1986, architects recommended the installation of a flood door to close off the parking garage during floods. The hotel was built in a ten-year flood zone. Such a door was installed. Operation of the door required that an employee pull up its gates, open a locked control box and push a button. Once the motor on the door is engaged, it takes a couple of minutes for the door to shut. Once the door is shut, an employee then must use an air compressor to inflate rubber seals around the door.

On July 20, 1992, Vera Rust attended a meeting scheduled for 6:00 p.m. at the hotel. Although Rust usually parked in the lot out-side of the hotel, she decided to park in the parking garage because it was raining heavily. There was no warning sign outside or inside the garage warning that it could be dangerous for her to park there. The National Weather Service had issued a flash flood warning that evening between 5:30 p.m. and 6:00 p.m. and, at 6:13 p.m., the Jefferson City Police Department began to receive reports of flooding in the area of the Hotel. At 6:29 p.m. flooding was reported at the State Laboratory Building. The State Laboratory was located next to the hotel, separated from the hotel by a berm.

There was a police scanner in the security office of the hotel. At approximately 6:55 p.m. David Shetterly, an employee of the hotel, heard a report of flooding at the Park Lane Hotel, located nearby. The hotel also received telephone calls from around the area, warning of flooding. David Davidson, a security officer for the hotel, joined Shetterly and the two men went out the back door of the hotel to the loading dock. They observed that 50 Highway was flooded and the parking lot of the State Laboratory was also flooded. They did not observe water coming over the berm onto hotel property at that time. They then went down to inspect the hotel's parking garage. Shetterly and Davidson did not close the flood door. Instead, the two men inspected all the levels of the parking garage, a task that took five to seven minutes. They then returned to the loading dock. Davidson went back inside the hotel to eat his dinner.

Approximately five minutes after Davidson had left the loading dock he was informed that water was flooding along the south side of the hotel. Davidson returned to the dock where he saw water flowing, "like a river." He also observed a few of the hotel's employees running to their cars. Davidson attempted to shut the flood door but was unable to do so.

Rust was attending a meeting at the Capitol Plaza, held in a room which had no windows. While the participants in that meeting were eating dinner, two who had left temporarily came back into the meeting room and reported that the parking garage was flooding. Ms. Rust left the room in an attempt to move her car, but she was prevented from

going to her car for safety reasons. Damage to the vehicle amounted to $4,889.62. Damage to property contained in the vehicle amounted to $370.00.

The jury returned a verdict in favor of Rust and against defendants John Q. Hammons and John Q. Hammons Hotels, Inc., awarding Rust $5,259.62 in damages. Hammons appeals.

### Subsequent Remedial Measures

In Point I, Hammons complains that the trial court erred in allowing Rust to introduce the exhibit into evidence because the introduction of Exhibit 13 violated the prohibition against subsequent remedial measures. Exhibit 13 is a photograph of a flood warning sign placed at the entrance to the parking garage after the flood. The sign read: "CAUTION—FLASH FLOODING MAY CLOSE THIS PARKING LOT WITHOUT WARNING—ALTERNATIVE PARKING INFORMATION AVAILABLE." The defense objected to the exhibit as impermissible evidence of subsequent remedial measures. Rust offered the exhibit to rebut evidence presented by Hammons that the hotel had made no changes in view of the flooding because it regarded the flood as an unprecedented occurrence which would not occur again. After hearing argument the trial court allowed the testimony, giving as its reason:

> For the record, the court is more persuaded by the fact that through questioning this witness, Mr. Dallmeyer, you've given this jury the information that the hotel is continuing to operate this hotel with exactly the same safety equipment, leaving the impression that the hotel is still comfortable without any modification. They continue to address the needs of patrons that might use it, whether, in fact, they have made some changes.

> I think that you've opened the door by putting in the testimony that the hotel is still doing today exactly what it was doing back then, whether, in fact, based upon Plaintiff's representation and Plaintiff's Exhibit 13, which has been previously reviewed by the court, the hotel has made some changes.

This court accords the trial court's ruling on the admissibility of the exhibit substantial deference and we will not disturb that ruling absent an abuse of discretion. An abuse of discretion is found when a ruling clearly violates the logic of the circumstances or is arbitrary or unreasonable. *Stinson v. E.I. DuPont De Nemours & Co.,* 904 S.W.2d 428, 432 (Mo.App.1995).

Evidence of subsequent remedial measures is inadmissible as proof of antecedent negligence. *Wingate by Carlisle v. Lester E. Cox Medical Center,* 853 S.W.2d 912, 917 (Mo. banc 1993). The justification for prohibiting such evidence is obvious—if evidence of precautions taken after an accident is admissible, remedial measures would never be taken. *Stinson,* 904 S.W.2d at 432. Furthermore, subsequent remedial measures are generally not relevant as to the conditions during the time in question. *Id.* Evidence of subsequent remedial measures may be admissible for other purposes, however. *Wingate,* 853 S.W.2d at 917. Among the exceptions are: (1) evidence offered to prove ownership or control; (2) evidence offered when the feasibility of precautionary measures is in dispute; and (3) evidence used as impeachment or rebuttal. *See Brooks v. Elders, Inc.,* 896 S.W.2d 744, 745 (Mo.App.1995).

In the instant case the general manager of the hotel testified that there were no structural changes made to the garage, nor any relocation of the entrance to the garage, after the flood. Besides testifying that there were no structural changes, he testified that the flood door is not closed, no one is stationed at the entrance to the garage, and no valet parking is provided. The trial court concluded that the manager's testimony was offered to show that the hotel is currently operating without any modifications, and is "still comfortable" without any modifications. The defense theory was that the rain and subsequent flooding were a freak of nature. Testimony given by a meteorologist was that such an event was not likely to happen again, that the circumstances were so unusual that "you are not going to see a flood like that again in Jefferson City." Clearly, the inference of the defense evidence was that there

was nothing the hotel could do or should do because the event was a completely freakish event and there would never be such a flood again. The defense opened the subject of whether it had made any changes since the flood, in an effort to suggest that, if any changes were appropriate, the hotel would have made them. Exhibit 13 was offered to cast doubt on the sincerity of this proposition by showing that the hotel did take at least one precautionary measure, a sign warning of possible flash flooding. This was rebuttal evidence. The sign was offered to contradict the hotel's assertion that the hotel was comfortable with the notion that no changes were called for after the flood because there would never be another flood. The trial judge was in the best position to judge the admissibility of the exhibit as rebuttal, and we do not find his ruling an abuse of discretion. Point I is denied.

### Ruling on Expert Testimony

At trial, Hammons sought to admit the testimony of Richard Freuh, a hydrologist retained by the defense, as to the time lapse between the time the water was cresting the berm separating the hotel from the State Laboratory and the time the water reached the parking garage. There was no evidence introduced as to the height of the water when it first crested the berm. Counsel for Rust objected to the question and the trial court sustained the objection.

Hammons argues in Point II that the trial court erred by refusing to admit the expert opinion testimony concerning the time lapse between the water cresting the berm and the water reaching the entrance to the parking garage. Hammons claims that there was a sufficient foundation for such evidence and that the exclusion of the evidence was prejudicial in that it prevented the defense from showing that Hammons' employees did not have time to close the flood door due to the rapid rise of the water. One of the contentions of negligence was that the hotel failed to shut the flood door before flooding of the parking garage began. The hydrologist was asked to calculate the time that would elapse between the time the water would go over the berm at varying heights and the time the

water would enter the garage. This question drew an objection on the basis that there was no evidence of what height the water was when it went over the berm. Defendant's offer of proof showed that the hydrologist would have testified: 1) that if we assume the water came over the berm at a height of six inches, it would have taken six minutes to reach the parking garage; 2) if the water had come over the berm at a height of one foot, it would have taken two minutes to reach the garage; and 3) if the water had come over the berm at a height of 1½ feet, it would have taken one minute to reach the garage. He also testified that if water came over the berm at a height of one foot, twelve minutes later it would have been in the garage at a depth of six inches. The trial court ruled:

> All right. The court finds there's not a reasonable—well, I think the question is relevance. I mean, I don't have any question that this witness has the credentials to testify if the water is coming six inches over the berm, he can do some mathematical questions and extrapolate from this.
>
> We just don't have any basis based upon the calculation offered to this court so far to make any statement what height the water is that went over the berm and so the court finds it's not relevant and would have a tendency to mislead the jury and for that reason particularly the court will sustain.

Hammons claims that there was sufficient factual foundation for the opinion in that various witnesses testified that, at one point after the water had initially crossed the berm, they saw water coming down behind the hotel like a river. The testified that the water was then five or six feet deep, and that two days after the flood, the high water mark was one and one-half feet over the height of the berm. None of this testimony, however, establishes the key factor—the height of the water when it *first* crested the berm.

The admissibility of expert testimony lies within the discretion of the trial court. *Cooper v. Ketcherside,* 907 S.W.2d 259, 260 (Mo.App.1995). The sufficiency of a hypothetical question posed to an expert witness is also within the broad discretion of the trial

court. *Riley v. Union Pac. R.R.*, 904 S.W.2d 437, 445 (Mo.App.1995). In *Wiley v. Pittsburg & Midway Coal Min. Co.*, 729 S.W.2d 228, 233 (Mo.App.1987), we stated:

> Where the opinion of the expert is drawn from a hypothetical question required because the expert lacks personal knowledge of all material facts, it is error to admit the testimony if the question does not embody substantially all of the material facts relating to the subject or omits necessary elements. The hypothetical question need not include all material facts in evidence but it must fairly hypothesize the material facts reasonably relevant to and justly presenting the questioner's theory of the case so that an answer of assistance to the jury in proper determination of the case may be elicited.

(Citations omitted).

■ In the instant case one of the figures necessary for the calculation of the time lapse was missing. Although a range for this figure can be hypothesized, it cannot be supplied with the precision necessary to allow for a meaningful opinion. It does not, therefore, "embody substantially all of the material facts." Defendant already had introduced evidence that the time frame within which the water crested the berm and entered the garage was less than five minutes. Defendant also introduced evidence that at least several minutes are required to fully close the flood door. The hydrologist could not say with certainty how much time elapsed between the time the water came over the berm and the time the water entered the garage. It is difficult to see how the expert testimony would have added anything meaningful to what the jury already knew. Defendant fails to show that any range the expert might have suggested would have been more helpful to the jury than the information about the five minute period already introduced. *Id.* The trial court found that the proposed evidence had a tendency to be confusing or misleading to the jury.[1] The trial court did not abuse its discretion in refusing to admit the evidence. Point II is denied.

### Failure to Warn Instructions

In Point III, Hammons contends that the trial court erred in submitting the verdict directing instructions to the jury because there was no evidence proving facts essential to a failure to warn theory. Specifically, Hammons argues that Rust failed to prove that the failure to warn that the parking garage was susceptible to flooding was the proximate cause of the damage that Rust suffered in that she did not testify that had she been warned she would not have parked in the parking garage. The instructions did not specifically require the jury to find that if a warning had been issued, the plaintiff would have heeded the warning. However, the instructions did require the jury to find that plaintiff sustained damage as a direct result of any negligent failure to warn, which implicitly involves believing that if a warning had been issued, plaintiff would have heeded it.

■ Appellant contends that there is no evidence supporting submission on a failure to warn theory because there is no evidence that a warning would have been heeded. It is true that in a failure to warn case the plaintiff must show that a warning would have altered the behavior of the plaintiff. *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992). However, the law is that in a failure to warn case it is not required that a showing be made with certainty that a warning would have prevented the injury. *Racer v. Utterman*, 629 S.W.2d 387, 394 (Mo.App.1981). In the circumstances of this case, where there was sufficient evidence from which a jury could find that the plaintiff did not already know the danger, there arose a rebuttable presumption that a warning would be heeded. *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. banc 1994). Here, Plaintiff testified it was raining heavily when she arrived, and for

---

1. The hotel assumes that there could be no duty to close the flood door until the water crossed the berm. We are not aware of anything which dictates that no duty arises until the water has come across the berm. The trial court might have believed, for instance, that admitting the proposed testimony might have had a tendency to suggest to the jury that everything depended upon the precise point of the water coming across the berm.

that reason she chose to park in the garage, being unaware of any danger of flooding. We can never know with certainty what she would have done if there had been a warning, but it comports with common sense to hold that, since she was not given a warning, she is entitled to the benefit of the presumption in the absence of any reason to deny her the presumption. The jury could reasonably conclude, in view of the applicable circumstances, that plaintiff would have altered her behavior if warned. There is no evidence to rebut the presumption that Rust would have heeded a warning. We hold the claim was submissible, and the trial court did not err in submitting the claim. Point III is denied.

### *Joinder of State Farm*

In his final point, Hammons asserts that the trial court erred in denying a defense motion to join State Farm (Rust's automobile insurer) as an additional party pursuant to Rule 52.04 or, in the alternative, to dismiss, because State Farm has a financial interest in this suit and further disposition of the action in the absence of State Farm would leave the parties subject to inconsistent or multiple obligations.

There is no evidence of an assignment before us. Where an insured does not assign his or her claim, the insured retains title to the action. *Protection Sprinkler Co. v. Lou Charno Studio, Inc.,* 888 S.W.2d 422, 424 (Mo.App.1994). Missouri distinguishes between subrogation and assignment:

> If a claim has been assigned, there is a complete divestment of all rights from the assignor and the vesting of those rights in the assignee. If the claim has been subrogated, an equitable right passes to the subrogee and the legal right to the claim remains in the subrogor.

*Klein v. General Elec. Co.,* 714 S.W.2d 896, 902 (Mo.App.1986). Because Rust retained the legal title to the cause of action she, not State Farm, is the real party in interest. Therefore joinder under Rule 52.04 was not necessary, nor would it cure any problem with multiple or potentially inconsistent

claims Hammons might encounter in subsequent suits. Point IV is denied.

The judgment of the trial court is affirmed.

All concur.