Ronald D. **HOBBS**, Respondent,

v.

John D. **HARKEN**, Appellant.

No. WD 54250.

Missouri Court of Appeals,
Western District.

June 9, 1998.

Paul V. Herbers, Andrew M. Jones, Cooling & Herbers, P.C., Kansas City, for appellant.

Thomas C. Capps, Michael S. Shipley, Withers, Brant, Igoe & Mullennix, P.C., Liberty, for respondent.

Before LAURA DENVIR STITH, P.J., and HANNA and RIEDERER, JJ.

LAURA DENVIR STITH, Presiding Judge.

Mr. Harken appeals a judgment against him in this personal injury action arising out of a four-car collision. He argues that the trial court erred in permitting an economic expert to testify to Mr. Hobbs' lost future wages based on the assumption that Mr. Hobbs' vertigo and its effect on his work would continue unabated for twenty years, where Mr. Hobbs failed to introduce evidence at trial that his vertigo was reasonably certain to continue unabated for that period. We agree that where, as here, the only medical evidence showed that Mr. Hobbs had yet to undergo rehabilitative therapies or surgery which his experts stated would improve his vertigo symptoms, and where his medical experts simply testified that symptoms such as his sometimes are mitigated or alleviated and other times continue unchanged, that it was error to admit the economic expert's testimony on future lost wages for twenty years. We disagree with Mr. Harken that an exhibit admitted by the trial court was a testimonial exhibit. Accordingly, we find that there was no automatic prohibition against sending it to the jury. Reversed and remanded.

## I. FACTUAL AND PROCEDURAL HISTORY

On December 8, 1994, a four-vehicle rear-end collision accident occurred in the center southbound lane on Interstate 35 in Johnson County, Kansas. The evidence below indicated that the first vehicle, driven by Michael Finnegan, stopped or almost stopped without warning. Despite the suddenness of Mr. Finnegan's stop, both Jose Valdes, who was driving the car immediately behind Mr. Finnegan's vehicle, and plaintiff Ronald Hobbs, whose car was behind that of Mr. Valdes, were able to stop their cars without striking the car in front of them. However, the

person driving the car behind Mr. Hobbs, John D. Harken, was unable to stop his car before it struck the rear end of Mr. Hobbs' vehicle. The force of that collision drove Mr. Hobbs' vehicle into the rear end of the Valdes' vehicle. As a result of this collision, Mr. Hobbs sustained several injuries and was unable to work for seven or eight weeks. He sued both Mr. Finnegan, who was driving the first car, and Mr. Harken, who was driving the fourth vehicle.

In support of his claims against these defendants, Mr. Hobbs presented evidence that his injuries resulting from the accident included both soft tissue injuries to his neck and back, and injuries to his inner ear. He testified that, even by the time of trial over two years after the accident, he was suffering from headaches two or three times a week, neck and upper back pain, hearing loss in his left ear, and dizziness and unsteadiness, all of which he attributed to his injuries from the accident.

Mr. Hobbs also presented testimony from two medical experts and from an economic expert to support his claim for damages. Dr. Steven Cicero, who had treated Mr. Hobbs for his back and neck injuries, testified by deposition. He stated that Mr. Hobbs had been released from treatment for his neck and back injuries by July, 1995, because he had reached maximum medical benefit. He also testified that no further treatment was necessary for Mr. Hobbs' neck and back complaints, but that Mr. Hobbs would probably have some continued neck and back discomfort in the future.

Mr. Hobbs also presented the deposition testimony of Dr. Avon Coffman, who treated Mr. Hobbs for his ear injuries. The evidence showed that Mr. Hobbs had a pre-existing hearing loss in his right ear which was not caused by the accident, and had pre-existing tinnitus in both ears. Dr. Coffman testified that the accident increased Mr. Hobbs' tinnitus. He did not testify that this tinnitus was permanent. Dr. Coffman testified that the accident caused Mr. Hobbs additional partial high-frequency hearing loss in the left ear. He said this caused Mr. Hobbs to have difficulty in discriminating certain sounds, and that this injury was permanent. Dr. Coff-

man prescribed a hearing aid. Mr. Hobbs testified that the hearing aid helped, although background noises would still sometimes interfere with his hearing. Neither Mr. Hobbs nor Dr. Coffman testified that Mr. Hobbs' hearing loss or tinnitus would effect his ability to work.

Finally, Dr. Coffman testified that the accident caused Mr. Hobbs to suffer from a vestibular disorder resulting in vertigo, unsteadiness, or dizziness. Dr. Coffman testified that the symptoms may be corrected by rehabilitation therapy, but explained that this therapy "won't ever remove the condition, it just allows him to become more functional with the condition that he has." Mr. Hobbs testified that he did not participate in this therapy because he could not pay its cost, which was $1,200 to $1,500. Dr. Coffman further testified that surgery was also available to correct Mr. Hobbs' vestibular condition, but that he would not recommend surgery as an option until Mr. Hobbs had tried the rehabilitation therapy. When asked whether he had an opinion, to a reasonable medical certainty, as to the permanence of Mr. Hobbs' vestibular disorder, Dr. Coffman stated:

> That's going to be harder to ascertain simply because so much of that is subjective. And as he improves with time and he has improved over the past year and a half that I have talked to him. He's still having and complaining of unsteadiness. It's obviously compromised his job performance but that's going to be harder to quantify as far as permanence of that injury but I would say if he gets into rehabilitation he's going to be improved. The question is will he ever be normal and I don't know anyone can answer that at this point in time. It's just hard to say. I can['t] answer about the hearing loss because we have objective data that says that hasn't changed in almost 2 years but his unsteadiness may or may not improve based on therapy and treatment so I couldn't answer that question.

There was no other medical evidence regarding the permanence of Mr. Hobbs' vestibular disorder.

Mr. Hobbs testified that his work as a frame carpenter included walking on narrow boards and rooftops, nailing sheeting on roofs, and handing up lumber. He claimed his neck and back pain, as well as his vertigo, required him to cut back substantially on his work schedule, and that, although he continued to do this type of work, this was only because he had no other way of making a living.

Mr. Hobbs' final expert witness was Dr. John Ward, an economist. Prior to trial, Mr. Harken had filed a motion in limine to prevent opposing counsel from mentioning Dr. Ward's opinion during opening statement. This motion was denied. During trial, Mr Harken objected to Dr. Ward's opinion testimony concerning future income loss, arguing that his opinion lacked sufficient factual basis. This objection was also overruled. The court granted a continuing objection to this opinion evidence throughout Dr. Ward's testimony. The court also overruled Mr. Harken's motion to strike Dr. Ward's testimony about future income loss.

Dr. Ward testified that Mr. Hobbs' future medical expenses, for replacement hearing aides and batteries, would be $10,506. Mr. Hobbs' actual medical expenses up to the time of trial were $5,545.37. Dr. Ward used two alternative approaches to estimate Mr. Hobbs' future income loss. Both approaches were based on the assumption that Mr. Hobbs would suffer from lost earning capacity for twenty years into the future. Under one approach, the lost earnings would be $180,585; under the other approach, they would be $274,480. Dr. Ward also testified that Mr. Hobbs' lost earnings up to the present time were between $23,312 and $38,950. Dr. Ward testified that, in determining lost future and past earnings, he had relied on answers provided on a questionnaire given to him by Mr. Hobbs' attorneys, on Mr. Hobbs' income tax records from 1990 through 1996, and on various other documents, all of which he testified are the type of documents ordinarily relied upon by experts in his field.

Dr. Ward testified that his estimates also were based upon the assumption that Mr. Hobbs' vestibular disorder was permanent and that his symptoms would continue with "absolutely no change" for the following twenty years. He further testified to his assumptions that Mr. Hobbs' neck, back, and headache pain were permanent and that Mr. Hobbs' pretrial income loss would continue without change for twenty years. Dr. Ward testified that his assumption of the permanency of the vestibular disorder was based upon a letter from Dr. Coffman and upon the representations of Mr. Hobbs' counsel. The letter from Dr. Coffman provided that:

> it is hard to predict how he will progress in the future although typically these inner ear injuries take months to resolve and sometimes patients are left with a permanent vestibular disorder.

Dr. Ward testified that if his assumption of the permanence of this disorder were unfounded, then his analysis of future loss of income would be significantly affected and that his numbers would be misleading if Mr. Hobbs' injuries would not affect his future income for the twenty years that Dr. Ward's calculations had presumed.

The jury returned a verdict for Mr. Hobbs for $340,000 and assessed 34% of the fault to Mr. Harken—the driver of the fourth car— and 66% of the fault to Mr. Finnegan—the driver of the first car. Mr. Harken filed a motion for new trial in which he asserted in part:

> The Court erred in allowing the economic testimony of Dr. Ward without adequate foundation. The medical testimony was consistent that no doctor established the permanency of any of plaintiff's complaints, and Dr. Ward admitted that he assumed such permanency in preparing his opinions. Accordingly, there was no foundation for his opinion testimony regarding lost future earnings. There must be a rational foundation, which was not established and the admission of the testimony was erroneous and prejudicial.

Mr. Harken's motion for new trial was denied. He now appeals.

## II. STANDARD OF REVIEW

It is within the sound discretion of the trial court to determine the admissibility of expert testimony and we will not reverse unless there is a clear abuse of that discretion.

*State v. Davis,* 814 S.W.2d 593, 603 (Mo. banc 1991); *State v. Sloan,* 912 S.W.2d 592, 596 (Mo.App.1995). A clear abuse of discretion only occurs when the court's ruling is " 'clearly against the logic of the circumstances or when it is arbitrary and unreasonable.' " *State v. Williams,* 828 S.W.2d 894, 899 (Mo.App.1992), *quoting, State v. Corpier,* 793 S.W.2d 430, 441 (Mo.App.1990).

### III. DR. WARD'S OPINION WAS NOT SUPPORTED BY FACTS IN EVIDENCE

In Mr. Harken's first Point Relied On, he claims that the trial court erred in admitting Dr. Ward's opinion testimony as to Mr. Hobbs' future income loss, and in refusing to strike this testimony, as the opinion was admitted without the necessary factual or evidentiary support for Dr. Ward's assumption that Mr. Hobbs' vestibular or other injuries would affect his earning capacity for twenty years into the future in the same way they had in the past. Mr. Hobbs replies that the court did not err in admitting this opinion testimony because Dr. Ward's opinion was supported by evidence that Mr. Hobbs suffered from a vestibular disorder which had continued for a long period of time, "which may or may not improve with therapy," but which would not be cured, and that Mr. Hobbs suffered from cervical, spine, thoracic and ribcage injuries which had reached maximum medical improvement. Mr. Hobbs says this evidence supported a finding by the jury that all of these medical conditions contributed to a steady twenty-year future loss of income by Mr. Hobbs.

■ We agree with Mr. Harken that the trial court erred in admitting, and then refusing to strike, Dr. Ward's testimony as to Mr. Hobbs' future lost wages. That testimony was based on the assumption that Mr. Hobbs' vestibular injuries would continue unabated for twenty years and there was no evidence to support that assumption. As both parties agree, the admissibility of expert testimony is determined by reference to Section 490.065.3, which states:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

■ As Mr. Hobbs notes, under this provision the evidence an expert relies on in forming his or her opinion "need not be independently admissible." *State v. Candela,* 929 S.W.2d 852, 866 (Mo.App.1996) (citations omitted). Thus, the mere fact that Dr. Ward's opinion was based in part on information provided to him by others concerning the continuing nature of Mr. Hobbs' disability would in no way preclude admission of that opinion if the opinion were otherwise reasonably reliable. Such an opinion may be based on hearsay and still be admissible if the expert testifies that the information on which he or she relied is of the type reasonably relied on by experts in the field.

It is true that Dr. Ward here testified that he relied on Mr. Hobbs' medical records and on information provided by Mr. Hobbs' counsel that his injuries would persist unchanged for twenty years, and that experts in his field reasonably relied on such evidence. On the facts of this case, however, such testimony was not sufficient to make his opinion reasonably reliable. This is because, while it may be reasonable in Dr. Ward's field to assume for the purposes of giving an opinion that information provided by lawyers about the nature of a person's injuries is accurate, lawyers are not doctors. If, in fact, at trial Mr. Hobbs failed to introduce medical evidence of such a long-lasting future injury, then the mere fact that Mr. Hobbs' attorneys said there would be such evidence could not bootstrap Dr. Ward's opinion into admissible evidence, for it would not be otherwise reasonably reliable.

Indeed, while we no longer require an expert to express his or her opinion in hypothetical terms, here, Dr. Ward's testimony was, in effect, hypothetical in form, for it was given based on the assumption that certain evidence would be offered to show that Mr. Hobbs' medical injuries would continue unchanged for twenty years. He agreed that, if they did not, then his analysis was defective. It is as if Mr. Hobbs' counsel had

asked Dr. Ward "assuming Mr. Hobbs's injuries continue for twenty years, what future lost wages will Mr. Hobbs suffer?"

■ Where, as here, an opinion is hypothetical in nature, it "must not be founded on mere assumption or surmise, but on facts within the expert's knowledge or upon hypothetical questions embracing proven facts." *Lazane v. Bean,* 782 S.W.2d 804, 806 (Mo. App.1990), *citing, Maples v. Charles Burt Realtor, Inc.,* 690 S.W.2d 202, 213 (Mo.App. 1985). For this reason, where:

> the opinion of the expert is drawn from a hypothetical question required because the expert lacks personal knowledge of all material facts, it is error to admit the testimony if the question does not embody substantially all of the material facts relating to the subject or omits necessary elements. The hypothetical question need not include all material facts in evidence but it must fairly hypothesize the material facts reasonably relevant to and justly presenting the questioner's theory of the case so that an answer of assistance to the jury in proper determination of the case may be elicited.

*Rust v. Hammons,* 929 S.W.2d 834, 839 (Mo. App.1996).

We held in *Rust* that the trial court had not erred in refusing to admit an expert's opinion concerning the time lapse between when water crested a berm and when the water reached the entrance to a parking garage, because this opinion lacked a sufficient factual basis. We held that, although the fact missing from the evidence could be hypothesized, "it [could not] be supplied with the precision necessary to allow for a meaningful opinion." *Id.* Accordingly, we found that the hypothetical did not "embody substantially all of the material facts," as required before an expert could state an opinion based upon it. *Id. See also Coppedge v. Missouri Highway and Transp. Comm'n,* 809 S.W.2d 164, 167 (Mo.App.1991) (court did not error in sustaining objection to hypothetical to expert which assumed facts not in evidence because "an expert's opinion must be based either upon facts within the expert's personal knowledge and observations or upon facts supported by competent evidence.").

■ Applying these principles to this case, the manner in which the question was put to Dr. Ward below would have been adequate if the injuries which Dr. Ward assumed affected Mr. Hobbs' earning capacity were established by the testimony of medical experts. This is because an expert can base his opinion on hypothesized facts if the facts are "either in the record or admissible as evidence." *Lytle v. T–Mac, Inc.,* 931 S.W.2d 496, 500 (Mo.App.1996), *citing, White v. American Republic Ins. Co.,* 799 S.W.2d 183, 193 (Mo.App.1990).

■ However, it is also a prerequisite that "[w]hen an expert is asked to assume certain facts are true in order to answer a hypothetical question, those facts must be established by the evidence.'" *Lytle,* 931 S.W.2d at 500, *quoting, Repple v. Barnes,* 778 S.W.2d 819, 822 (Mo.App.1989). We reject Mr. Hobbs' contention that this does not mean he had to present testimony that his injuries and their affect on his earning capacity were reasonably certain to be permanent or to persist for twenty years into the future. The cases he relies on for this argument are distinguishable.

*Robinson v. Empiregas, Inc.,* 906 S.W.2d 829 (Mo.App.1995), merely held that "inevitably there is a degree of speculation in determining the *present value* of the wages an injured party would have earned but for his injury." *Id.* at 842. It also recognized, however, that the law requires that the evidence which is introduced must "lay a foundation to enable the jury to make a fair and reasonable estimate, " *Id.,* and further held that "the value of a loss of future earnings may not rest upon speculation." *Id., citing, Haley v. Byers Trans. Co.,* 414 S.W.2d 777 (Mo. banc 1967). Rather, it must be proved with reasonable certainty. *See, e.g., Thienes v. Harlin Fruit Co.,* 499 S.W.2d 223, 229–30 (Mo. App.1973). "[R]easonable certainty contemplates and demands something more than a showing of contingent or speculative occurrences, possible or even probable developments, or conjecture, likelihood and probability." *Thienes,* 499 S.W.2d at 230 (citations omitted). *See also Carter v. Jones Truck Lines, Inc.,* 943 S.W.2d 821, 827 (Mo.App.

1997) (citations omitted) (an expert's opinion that does not indicate that he is expressing a conclusion that the purported mishap caused a particular loss with reasonable medical certainty, "is insufficient to support a finding that a particular event caused the ailments in issue. Such testimony expresses only educated speculation, and amounts to nothing more than an assurance that the result was scientifically possible").

Similarly, *Milam v. Vestal,* 671 S.W.2d 448, 451 (Mo.App.1984), and cases cited by it, simply recognize that " '[f]uture damages' is a term broad enough to include future pain and suffering and intermittent loss of ability to work and earn, and a showing of permanent injury is not essential to a hypothesis and submission of future damage," *Id.,* and that "long continuance of conditions existing at trial is sufficient to warrant giving an instruction on damages from future pain and suffering." *Id.* at 451. Similarly, we held in *McPherson v. Bi–State Development Agency,* 702 S.W.2d 129, 131 (Mo.App.1985), that evidence of conditions justifying an instruction on future pain and suffering "may come solely from the plaintiff and need not be corroborated by medical evidence . . . ."

■ Here, however, Mr. Harken does not dispute that Mr. Hobbs was entitled to submit a claim for future pain and suffering. Similarly, the evidence that Mr. Hobbs was still suffering the debilitating effects of his injuries at trial and the evidence of continued headaches and back and neck pain supported submission of some future period of suffering or of an intermittent loss of ability to work. There was no evidence from which the jury could determine that his present loss of earning capacity would continue unabated for twenty years, however. "The rule is that an expert witness can only testify as to the future consequences of an injury if they are reasonably certain to occur." *Stuart v. State Farm Mutual Auto. Ins. Co.,* 699 S.W.2d 450, 455 (Mo.App.1985).

For this reason, we find *First National Bank of Fort Smith v. Kansas City Southern Ry. Co.,* 865 S.W.2d 719, 738 (Mo.App.1993), to be more on point. The plaintiff in that case presented evidence of serious physical injuries resulting from an accident, but failed to offer medical testimony that the plaintiff would become a paraplegic or be confined to a wheelchair. The trial court nonetheless admitted the testimony of a "life care plan expert" who assumed that the plaintiff would become a paraplegic or confined to a wheelchair and testified that this care would cost $1.8 million. We held that because the life care plan expert's opinion lacked substantial evidentiary support, the court erred in admitting this opinion, for " 'future damages in a personal injury action are not compensable unless reasonably certain to occur.' " *Id.,quoting, Bennett v. Mallinckrodt,* 698 S.W.2d 854, 866 (Mo.App.1985), *cert. denied,* 476 U.S. 1176, 106 S.Ct. 2903, 90 L.Ed.2d 989 (1986). We further found that it was "not enough for the doctor to testify to the possibility of a certain result; his testimony should show that it is reasonably certain to follow the injury. Consequences which are contingent, speculative, or merely possible are not proper to be considered by the jury in ascertaining the damages, for it would be plainly unjust to compel one to pay damages for results that may or may not ensue and which are merely problematical." [1]

Here, as in *First National,* there was no medical testimony supporting the assumptions underlying Dr. Ward's estimated damages. In *First National,* the assumption underlying the estimates of damages was that the plaintiff would become paraplegic or confined to a wheelchair; medical experts had testified that these were possibilities. In the present case, an essential assumption underlying Dr. Ward's calculations of future lost earnings was that Mr. Hobbs' vestibular condition would remain unchanged for twenty years. However, evidence of this fact,

---

1. *Id.* at 738–39, *citing, Hahn v. McDowell,* 349 S.W.2d 479, 482 (Mo.App.1961). *See also, Hines v. Sweet,* 567 S.W.2d 435, 438 (Mo.App.1978); *Timmons v. Mass. Transp. Authority,* 412 Mass. 646, 591 N.E.2d 667, 670–71 (1992) (holding that admission of vocational rehabilitation expert's opinion of future loss of earnings was prejudicial error because the expert assumed that the injury was permanent and this assumption was not supported by the evidence and that the plaintiff's own testimony could not provide the foundation for the expert's assumptions as to the extent and duration of injuries).

relied on by Dr. Ward, simply was not admitted either at the time he testified or later.[2]

Specifically, Dr. Ward testified that he assumed that Mr. Hobbs' vestibular disorder was permanent and that his symptoms would continue for twenty years. He also acknowledged that, if this assumption were wrong, his analysis of future loss of income would be significantly affected and would make his estimates misleading. He based this assumption on answers to an unsigned questionnaire returned from Mr. Hobbs' attorney and on a letter from Dr. Coffman which stated that "it is hard to predict how [Mr. Hobbs] will progress in the future although typically these inner ear injuries take months to resolve and *sometimes* patients are left with a permanent vestibular disorder." He may have assumed that, at trial, another witness would be able to give an opinion based on reasonable certainty. Neither Dr. Coffman nor another physician stated that to a reasonable degree of medical certainty Mr. Hobbs' vestibular disorder would be permanent or would last twenty years into the future, however. In fact, in explaining what he believed would be the future course of Mr. Hobbs' injuries, Dr. Coffman stated only:

> That's going to be harder to ascertain simply because so much of that is subjective. And as he improves with time and he has improved over the past year and a half that I have talked to him. He's still having and complaining of unsteadiness. It's obviously compromised his job performance but that's going to be harder to quantify as far as permanence of that injury but I would say if he gets into rehabilitation he's going to be improved. The question is will he ever be normal and I don't know anyone can answer that at this point in time. It's just hard to say. I can['t] answer about the hearing loss because we have objective data that says that hasn't changed in almost 2 years but his unsteadiness may or may not improve based on therapy and treatment so I couldn't answer that question.

There was no other medical evidence regarding the permanence or persistence of Mr. Hobbs' vestibular disorder. In fact, the testimony indicated that Mr. Hobbs' symptoms, which were what affected his ability to work, *would* improve or disappear with therapy and, perhaps, ultimately, with surgery. As was true in *First National,* and in *Rust,* Dr. Ward's opinion estimating future damages thus lacked a substantial evidentiary basis for his assumption that, to a reasonable degree of medical certainty, Mr. Hobbs' vestibular injury would persist unabated for twenty years. Accordingly, the court erred in admitting Dr. Ward's opinion. We cannot say based on the evidence and the size of the verdict that this error was not prejudicial, for the amount awarded by the jury was in excess of the amount of past and future lost earnings and medical expenses testified to by Dr. Ward. We thus reverse and remand for a new trial on all issues.

## IV. ADMISSION OF EXHIBIT 29

■ In his second Point Relied On, Mr. Harken claims that the trial court erred in admitting Exhibit 29, a summary of Dr. Ward's opinion about future income loss, because the exhibit lacked the same factual and evidentiary foundation as did Dr. Ward's testimony. This argument is governed by our analysis of Point I, and need not be separately addressed here.

In his third Point Relied On, Mr. Harken claims that the court erred in allowing Exhibit 29 to go to the jury during deliberations. To understand this objection, it is necessary to set out the events surrounding the admission of Exhibit 29. As just noted, Exhibit 29 was a chart indicating Dr. Ward's estimated damages, including future and past income loss, and was admitted into evidence over Mr. Harken's objection. While Exhibit 29 stated Dr. Ward's calculations regarding Mr. Hobbs' loss of income, it nowhere indicated the assumptions on which Dr. Ward's calculations were based. When Mr. Harken tried to write the assumptions underlying

**2.** In a case in which it is anticipated that a medical expert will offer the necessary foundational opinion about future injury, the medical testimony could be presented first, or the economic expert could testify first subject to a motion to strike if adequate medical testimony were not, in fact, introduced.

these calculations on the exhibit during cross-examination, Mr. Hobbs objected that this writing might "distort the meaning of the exhibit" and suggested that Mr. Harken write on something separate. Mr. Harken stated that the assumptions should be placed on the exhibit "because if the jury asks to take it back into the jury room later they need to know what the assumptions are." The court responded that "neither of these exhibits probably should go to the jury because they are testimonial. Testimonial exhibits don't go to the jury." Mr. Harken stated that if the exhibit was not going to the jury, then he did not need to mark on it.

During jury deliberations, the jury requested Exhibit 29. The court initially refused the request, stating that it "considers that a testimonial exhibit and it will not go up in view of the objection." When the jury again requested the exhibit, the trial court allowed the exhibit to go to the jury, despite Mr. Harken's objection. One-half hour later, the jury returned a verdict for Mr. Hobbs for $340,000. Mr. Harken argues that admission of the exhibit was prejudicial error because it was a testimonial exhibit which can never be sent to the jury and also because he had abandoned his attempt to write Dr. Ward's assumptions on the exhibit in specific reliance on the court's ruling that the exhibit would not go to the jury.

 We need not determine whether, on these unique facts, the trial court abused its discretion in reversing its earlier ruling that the exhibit would not go to the jury,[3] for we are remanding for a new trial and we presume this fact situation will not recur on remand. However, the issue of whether this or a similar exhibit is a testimonial exhibit and whether it may go to the jury may arise again on remand if evidence is presented in the second trial supporting future damages

for lost wages. Accordingly, we exercise our discretion to consider it.

Mr. Harken relies on *O'Neal v. Pipes Enterprises, Inc.,* 930 S.W.2d 416 (Mo.App. 1995), to support his argument that Exhibit 29 was a "summary testimonial exhibit" and hence could not be allowed to go to the jury. In *O'Neal,* the trial court allowed the jury to take into the jury room an "exhibit" which was the videotaped testimony of a witness. We held that the trial court erred in sending this videotaped deposition to the jury room because it violated "the long-standing rule in Missouri that trial testimony may not be reread to the jury without the consent of both parties." *Id.* at 421 (citations omitted). We held that the principle underlying this rule is "that repetition of a portion of trial testimony would cause that portion to be emphasized by reiteration, which in turn 'might lead to interminable confusion or to an unwarranted advantage to one party over the other,' and which further would invade a juror's duty to solely determine the facts according to their memory alone." *Id.* at 421, *quoting, Isreal v. Fanchon & Marco,* 58 S.W.2d 774, 778 (Mo.App.1933). Accordingly, we found that this error was prejudicial, since the testimony indicated the plaintiff's comparative fault, which the jury found against the plaintiff, in spite of evidence to the contrary. *Id.* at 422.

Unlike Exhibit 29, the videotape at issue in *O'Neal* contained the actual testimony of a witness. Mr. Harken cites us to no authority, nor do we find any, that an exhibit such as Exhibit 29, which simply sets out certain of the conclusions and calculations testified to by a witness, should also be characterized as a testimonial exhibit. To the contrary, many exhibits contain opinions or facts also testified to by witnesses. Many such exhibits are

---

**3.** Normally, "the law is clear a trial court has broad discretion sending exhibits to the jury." *Hamilton v. Washington Univ.,* 628 S.W.2d 925, 926 (Mo.App.1982), *citing, Freeman v. DeHart,* 303 S.W.2d 217 (Mo.App.1957); *Ortner v. Terry,* 533 S.W.2d 640 (Mo.App.1976). *See also State v. Sullivan,* 925 S.W.2d 483, 485 (Mo.App.1996). This discretion is abused only when allowing an exhibit to go to the jury was "untenable and clearly against reason, and work[s] an injustice." *State v. Jennings,* 815 S.W.2d 434, 440 (Mo.App.

1991). The trial court also has broad discretion in deciding whether to allow an exhibit used "merely to illustrate or explain the testimony of witnesses" to go to the jury room during deliberations. *Lester v. Sayles,* 850 S.W.2d 858, 863 (Mo. banc 1993). However, if the exhibit is "neither formally introduced nor constructively introduced [into] evidence, they should never be subject to inspection in the jury room. In these instances the trial judge has no discretion." *Id.*

used by witnesses during their testimony in order to help explain the witness' testimony, or as a way of assisting the jury in understanding complicated issues or summarizing lengthy records. We agree with Mr. Hobbs that such exhibits are not the type of testimonial exhibit which *O'Neal* said could not go to the jury room. Because the exhibit at issue here did not constitute a prior trial transcript or deposition, but was rather simply a summary of calculations made by the witness, it was not a testimonial exhibit and the trial court was not prohibited from sending it to the jury.

For the reasons stated above, the case is reversed and remanded for a new trial on all issues.

HANNA and RIEDERER, JJ., concur.