Jackie K. DAUGHERTY, Respondent,

v.

NORTH KANSAS CITY MEMORIAL HOSPITAL, Appellant.

No. KCD 29003.

Missouri Court of Appeals, Kansas City District.

Aug. 28, 1978.

Dean F. Arnold and B. W. Jacob, Kansas City, for appellant.

David R. Odegard and Robert M. Sommers, Kansas City, for respondent; James, Odegard & Millert, Kansas City, of counsel.

Before WELBORN, Special Judge, Presiding, Higgins, Special Judge, and PRITCHARD, J.

PRITCHARD, Judge.

Respondent recovered judgment, upon a verdict of a jury, for $30,000, upon her claim of negligence, as submitted in Instruction No. 4, that appellant allowed an ice collar to remain upon respondent too long [thereby causing Bell's Palsy, which, according to the record, resulted from a swelling of the cranial nerve in the bony passageway to the face].

Appellant's contentions are, first, that the court erred in failing to direct a verdict in its favor because respondent did not make a submissible case in that she produced no expert medical evidence that it violated any standard of care; and second, Instruction No. 4 was erroneous because it also was not supported by expert medical evidence.

Instruction No. 4 is:

"Your verdict must be for the plaintiff and against defendant North Kansas City Memorial Hospital if you believe:

First, defendant North Kansas City Memorial Hospital allowed the ice collar to remain on plaintiff too long,

Second, defendant North Kansas City Memorial Hospital was thereby negligent, and

Third, as a direct result of such negligence plaintiff sustained damage.

"The term 'negligence' as used in this instruction means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

On the evening of June 8, 1970, respondent entered the hospital for a tonsillectomy scheduled the following morning, at which time she received an injection of 100 mg. Demerol which caused her to be drowsy. At 8:45 a. m., in the operating room she received an injection of sodium pentothal, which caused her to be unconscious. Respondent did not recall regaining consciousness until about noon on the same day.

The operating surgeon, Dr. Parker, prescribed post-operative injections of 50 mg. Demerol every 4 hours, which dosage was sufficient to cause drowsiness or sedation, and respondent was given this dosage at 10:55 a. m., and again at 3:30 p. m. She was also given Empirin No. 3 at 2:00, 5:00 and 7:00 p. m., on the day of the operation. After the operation, Dr. Parker left orders to appellant's nursing staff that an ice collar was to be applied to respondent "ad lib", which means "at the patient's desire." After respondent awoke, Dr. Parker advised her that he would give her an ice pack for her throat, and he instructed the nurse to change it from side to side every two hours.

Respondent testified that after she awakened in her room about noon, Dr. Parker was there and told her he would give her an ice pack for her throat, and he also told the nurse to switch it every two hours, and she went back off to sleep. She awakened in mid-afternoon, at which time the ice collar was on, covering her ear and jaw. She was given a pain pill and went back off to sleep. She next awakened around 5:30 or 6:00 that evening at which time the ice bag was still on the right side of her face. Her face was numb and red, and she had some burning or itching sensation on the right side of her face. She removed the ice collar and did not reapply it that night, but she used it the next day, switching it from side to side as directed by the nurse.

Dr. Parker saw respondent the evening of the second day, and asked her why she was winking at him. It was discovered that she could not close her right eye, and she could not move the right side of her face. It was Dr. Parker's notation on respondent's medical chart that she developed Bell's Palsy on the second post-operative day, considered to be due to the refrigeration effect of the collar. There was medical evidence from

Dr. Kovac as to this same causation, and that respondent's condition is permanent and progressive. There was also evidence that if a nurse applied an ice collar to a sleeping or unconscious patient, she would not be following the doctor's orders to apply the collar "ad lib"; and that if the patient is asleep or unconscious, she cannot make her desires known to the nurse.

There was no expert evidence as to any existent standard of care required of hospital attendants and nurses in applying ice collars to patients such as respondent. No expert testimony was necessary, however, because the gist of respondent's claim of negligence is based upon the failure of the nurses to follow the doctor's orders to change the ice collar from the right side to the left side every two hours, and to apply it at the patient's request. This failure to follow orders occasioned the ice collar being left on too long, as submitted as the ultimate fact in Instruction No. 4. See the similar case of *Larrimore v. Homeopathic Hospital Association of Delaware*, 4 Storey 449, 54 Del. 449, 181 A.2d 573, 577[2] (1962), where it was said, "In the case at bar, the nurse had but to read all the physician's instructions appearing on the Order Sheet in order to avoid the mistake she made. It appears in the record by expert testimony that the very purpose of the Order Sheet is to guide the nurses in carrying out the doctor's orders. This being so, we think the calling of an expert witness to testify that the failure of a nurse to follow the doctor's written instructions was a violation of the expected standards of her profession, would be an empty gesture. * * * However, we think the particular issue did not require the establishment of standards by experts." In *Toth v. Community Hospital at Glen Cove*, 22 N.Y.2d 255, 292 N.Y.S.2d 440, 449, 239 N.E.2d 368, 374[12] (App.1968), the court said, "With respect to the hospital, there can be little dispute that the plaintiffs made out a prima facie case when they introduced substantial evidence to establish that the nurses had not conformed to the pediatrician's orders." The rationale for the rule in cases where expert testimony is not needed is stated in *Washington Hospital Center v. Butler*, 127 U.S.App.D.C. 379, 384, 384 F.2d 331, 336[6, 7] (1967), "Nor is there peculiar need for expert testimony on any issue the resolution of which would not extend the jury beyond the range of ordinary lay knowledge and experience. * * * ' "[T]here must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skillful in the particular science to show unskillful and negligent treatment." ' " Compare also *Howard v. Research Hospital & Medical Ctr., Inc.*, 563 S.W.2d 111, 112[1, 2] (Mo.App. 1978), and cases cited; *Stallman v. Robinson*, 364 Mo. 275, 260 S.W.2d 743, 749 (1953). Respondent made a submissible case of negligence of appellant in its nurses' failure to follow the physician's orders to her damage. It follows that Instruction No. 4 is supported by the evidence, and its giving was not error as contended.

■ Appellant's last contention is that the trial court erred in admitting Dr. Kovac's deposition because he was not shown to be unavailable for the trial under Rule 57.07. The doctor's x-ray technician testified at trial that he was at his office attending pre-scheduled patients and would be there all morning, and that he was scheduled to see patients at an industrial plant and downtown all afternoon. This is direct, positive evidence of unavailability, different than the hearsay testimony to establish the fact in *Tillman v. Wedge Mobile Service Station*, 565 S.W.2d 653 (Mo.App. 1978). The trial court here properly found unavailability.

The judgment is affirmed.

All concur.