**Vincent REDEL and Rita Redel, Respondents,**

v.

**CAPITAL REGION MEDICAL CENTER, Appellant.**

**No. ED 84559.**

Missouri Court of Appeals, Eastern District, Division Four.

May 10, 2005.

Charles J. McPheeters, Edward C. Clausen, Jefferson City, MO, for appellant.

Patrick J. Berrigan, Kathleen M. Hagen, Kansas City, MO, for respondent.

LAWRENCE G. CRAHAN, Judge.

Capital Region Medical Center ("Hospital") appeals the judgment entered upon a jury's verdict in favor of Vincent Redel ("Patient") and Rita Redel ("Wife") (collectively "Plaintiffs") for Hospital's medical negligence. We affirm in part and reverse and remand in part.

On October 26, 1998, Patient underwent bilateral knee replacement surgery, or surgery replacing both of his knees, at St. Mary's Hospital in Jefferson City, Missouri. Upon completion of the surgery, Patient's orthopedic surgeon, Dr. Timothy Galbraith, ordered Patient to receive physical therapy, including therapy through the use of a continuous passive motion ("CPM") machine. A CPM machine moves the knee joint through a predetermined range of motion without requiring the patient to use any leg muscles to do the work. Application of the CPM machine was intended to prevent Patient's

knees from becoming stiff due to lack of movement following surgery.

During the five days Patient remained at St. Mary's after surgery, Patient made steady progress in his recovery, and by October 30 he had 110 degrees of flexion in both knees and could walk with minimal assistance. Patient was discharged from St. Mary's on October 30 and transferred to Hospital for continued rehabilitative treatment. When Patient arrived at Hospital, he initially was able to ambulate twenty feet with minimal assistance and had almost normal ankle strength. However, the oxygen level in Patient's blood began to drop that night, rendering Patient hypoxic. Hospital admitted him into the intensive care unit ("ICU"). While in the ICU, Patient was anemic and suffering from an abnormally high heart rate. Patient was also confused, disoriented and agitated, was unable to recognize Dr. Galbraith, and was eager to get out of the ICU and go home.

Beginning at 7:00 in the evening on October 31, Nurse Cynthia Mote took charge of Patient. According to Dr. Galbraith's notes regarding Patient, Patient was to receive CPM therapy. Nurse Mote was not familiar with administering CPM therapy and asked for assistance from Nurse Jennifer Moyer. At some point, Nurse Mote asked Patient whether he would allow her to administer CPM therapy and he refused. According to Wife, sometime in the morning of November 1, Nurse Mote explained to her that Patient had to undergo CPM therapy and had Nurse Moyer help apply the first CPM machine to one of Patient's legs. After Nurse Moyer left the room, Nurse Mote had trouble putting the second CPM machine on Patient's other leg, so Wife helped her. With both machines moving his legs, Patient was confused and disoriented. He kept moving around, tossing and pulling himself by the bed handles, and flipping the machines so that they were knocked out of alignment. The machines continued to move his legs.

Dr. Galbraith arrived at Hospital while Patient was strapped into the CPM machines lying sideways rather than on his back. He took the machines off of Patient and stated that he was concerned that Patient was so confused he likely could not express the degree of pain he was in. He was also disappointed that Hospital personnel failed to follow his verbal orders to watch Patient closely because of his disorientation and to only place Patient in one CPM machine at a time.

About two hours after the CPM incident, physical therapist Mary Rakestraw discovered that Patient had "drop foot," a condition meaning that Patient lost all dorsiflexion in both ankles so that he could no longer lift either of his feet up by the ankle. Shortly after his discharge from Hospital, Patient was fitted with special braces to hold his feet in place so that he could walk. In addition, over time, neurologists assisted him in finding pain medications to reduce the severe pain Patient experienced since his stay at Hospital. Plaintiffs then filed an action against Hospital based on the negligent treatment that caused permanent drop foot to Patient.

At trial, among other witnesses, Plaintiffs presented physical therapist Kathy Allison to testify regarding the standard of care applicable to the use of CPM therapy. Ms. Allison testified that based on her education, experience, and her review of the available literature, applying a CPM machine to a confused patient and applying two units at once is unacceptable. Plaintiffs also called Dr. Brenda Woods, who specializes in physical medicine and rehabilitation, to testify regarding her treatment of Patient, which involved assessing whether Plaintiff would benefit from coming into Hospital's rehabilitation

unit after Patient was discharged from the ICU. Plaintiffs asked Dr. Woods general questions about when and in what way it is appropriate to administer CPM therapy to a patient. Plaintiffs called Ms. Rakestraw and physical therapist Jason Gorene to testify regarding their rehabilitative treatment of Patient. Both Ms. Rakestraw and Mr. Gorene testified that they never apply two CPM machines to one patient at the same time.

By playing a video-taped deposition, Plaintiffs presented the testimony of Dr. Bernard Abrams regarding what caused Patient's drop foot and, over objection, that Patient's medical expenses were reasonable. In testifying about Patient's medical bills, Dr. Abrams also testified that Patient would need to take medication for the rest of his life and replace his $2000 braces every three to five years. Plaintiffs called economist Dr. John Ward to explain the actual damages Plaintiffs incurred from Patient's injury. In doing so, Dr. Ward described Patient's former employment as a business-owner running a combination convenience store and automotive garage. He also calculated Patient's past and future medical expenses based on Patient's medical bills.

Finally, Plaintiffs called Patient and Wife to testify about the incident and how it has affected their lives. Wife noted that, in addition to going through two braces since 1998, Patient requires $200 orthopedic shoes. At the close of evidence, the jury returned a verdict in favor of Plaintiffs. Patient was awarded $163,000 for past economic damages, including medical expenses, $300,000 for past non-economic damages, $25,000 for future medical expenses, $187,000 for future economic damages excluding medical damages and $200,000 for future non-economic damages. Wife was awarded $75,000 for past non-economic damages

and $50,000 for future non-economic damages. The trial court entered judgment in the amount of $875,000 in favor of Patient and $125,000 in favor of Wife. This appeal follows.

In its first point on appeal, Hospital argues that Plaintiffs failed to make a submissible case because they did not establish that Hospital failed to meet an objective standard of care. When reviewing whether a plaintiff makes a submissible case for negligence against a defendant, we view the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, and we disregard all evidence contrary to the plaintiff's claim. *Ladish v. Gordon*, 879 S.W.2d 623, 627–28 (Mo.App.1994). For Plaintiffs to demonstrate a prima facie claim for medical malpractice, they must establish the following elements: (1) proof that the act or omission failed to meet the requisite standard of medical care; (2) proof that the act or omission was performed negligently; and (3) a causal connection between the act or omission and the claimed injury sustained by the plaintiff. *Delisi v. St. Luke's Episcopal–Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 173 (Mo.App.1985).

Specific to Hospital's claim, to make a submissible case on Hospital's failure to satisfy the requisite standard of care, Plaintiffs are required to show that Hospital failed to exercise that degree of skill and learning ordinarily exercised under the same or similar circumstances by members of its profession. *Id.; M.W. v. Jewish Hosp. Ass'n. of St. Louis*, 637 S.W.2d 74, 76 (Mo.App.1982) (applying medical malpractice standard of care to hospitals). The general rule requires that Plaintiffs put forth expert medical testimony establishing the appropriate standard of care. *Delisi*, 701 S.W.2d at 173. Ex-

pert testimony is not required, however, if the defendant's own testimony establishes the standard of care. *Id.* In addition, no expert testimony is necessary where the basis of a plaintiff's claim of negligence is the nurse's failure to follow a doctor's orders. *Daugherty v. N. Kansas City Mem'l Hosp.*, 570 S.W.2d 795, 797 (Mo.App.1978).

In *Daugherty*, the patient brought a claim against her treating hospital because a nurse failed to switch an ice pack on her throat from side to side every two hours, as ordered by the patient's doctor, resulting in permanent and progressive Bell's Palsy to the patient's face. *Id.* at 796–97. The hospital argued on appeal that the patient failed to make a submissible case because she produced no expert medical evidence that the nurse's conduct violated any standard of care. *Id.* at 796. The court held that no expert testimony was necessary because patient's claim was based on the failure of the nurses to follow the doctor's orders. *Id.* at 797. In making its decision, the court stated that the calling of an expert witness to testify that the failure of a nurse to follow a doctor's orders was a violation of the expected standards of the nurse's profession would be an empty gesture. *Id.* The court further stated that the rationale for the rule is that there is no peculiar need for expert testimony on any issue within the jury's ordinary lay knowledge and experience. *Id.*

■ Like the patient in *Daugherty*, Plaintiffs' claim of negligence was based on Nurse Mote's failure to follow Dr. Galbraith's orders to administer CPM therapy to only one of Patient's legs at a time and to monitor Patient closely to the extent Patient was disoriented. Thus, it was unnecessary for Plaintiffs to offer expert testimony that it was a violation of the standard of care to use two CPM machines at once or to apply CPM therapy when Patient was disoriented. Accordingly, Plain-

tiffs presented a submissible case on this basis alone.

Plaintiffs also established the standard of care through various employees of Hospital who testified regarding the appropriateness of placing a patient in two CPM machines at the same time. For instance, when Plaintiffs asked Gorene, "Well, a nurse shouldn't put two CPMs on one person, period, right?," Gorene responded "Correct. We never do that." Rakestraw also testified that it is never appropriate to put a patient in two CPM machines at the same time. Finally, Dr. Woods testified that, as a rehab specialist in medicine familiar with CPM therapy, she does not order bilateral CPMs to be done at the same time and that it would be extremely difficult to do so.

Reviewing this evidence, we find that *Delisi* also assists in our analysis of Hospital's contention. In *Delisi*, the plaintiff injured his hand on a rusty knife and claimed that his doctor violated the standard of care by failing to prescribe certain antibiotics that would have prevented the plaintiff from developing an infection that caused damage beyond the damage he would have suffered from the original knife wound. 701 S.W.2d at 173. At trial, the plaintiffs offered no evidence other than reading excerpts from the defendant doctor's deposition, during which the doctor did not specifically state that he was applying an objective standard of care. *Id.* The doctor and hospital argued on appeal that the plaintiff failed to make a submissible case because the plaintiff did not adduce substantial evidence proving that the doctor failed to satisfy the requisite standard of medical care. *Id.* The appellate court held that even though the plaintiff put forth no independent expert medical testimony, the doctor's own testimony, both in the excerpts and the testimony he presented on his own behalf at

trial, established the standard of care. *Id.* at 174.

Like the doctor's testimony in *Delisi*, Hospital's employees did not specifically refer to the medical community at large in their testimony. Nevertheless, Hospital's employees testified in general terms that it is not appropriate to administer CPM therapy using two CPM machines at the same time. Under *Delisi*, this testimony is sufficient to establish the standard of care without additional expert testimony.

Relying on *Ladish*, Hospital focuses solely on Ms. Allison's testimony, arguing that it failed to establish that she was applying an objective, profession-wide standard of care to the actions of the nurses at Hospital so that the jury had no way to know what standard was being used. We disagree. In *Ladish*, the plaintiff underwent surgery to remove genital warts. 879 S.W.2d at 626. After surgery, the plaintiff experienced some complications including a great deal of swelling in her genital area and adherence of the labial lips which required separation. *Id.* at 627. She brought an action against the doctor for negligence based on the doctor's treatment of her condition. *Id.* On appeal, the doctor argued that the plaintiff failed to make a submissible case because she failed to establish the standard of care. *Id.* The appellate court found that in most instances, the evidence the plaintiff presented regarding the standard of care did not sufficiently inform the jury of the applicable standard of care. *Id.* at 629–33. In doing so, it noted that the plaintiff's expert witness tended to merely state that "it might have been more appropriate" if the plaintiff's doctor acted differently. *Id.* In addition, the expert frequently based his testimony on assumptions that the plaintiff did not prove were actually true. *Id.*

In holding that the plaintiff did not make a submissible case for several of her theories of negligence, the *Ladish* court reasoned that the use of the terms "accepted medical standards" and "standards of care" do not in themselves satisfactorily articulate the appropriate legal standard. *Id.* at 634. Instead, care should be taken by counsel in every case, with every expert witness, to make sure the expert is properly oriented with regard to the meaning of the concept of negligence in the instance of a health care provider. *Id.* It is not enough that a jury instruction informs the jury of the meaning of negligence or that some other witness testifies to that witness's understanding of negligence in that context. *Id.* Rather, it is necessary in each case that the fact-finder be informed as to whether the witness, in offering opinions, is using the standard prescribed by law and not some other standard. *Id.*

We find that Ms. Allison's expert testimony is distinguishable from the testimony of the plaintiff's expert in *Ladish*. Unlike the expert in *Ladish*, Ms. Allison did not merely state that another use of the CPM machines at Hospital would have been more appropriate. Moreover, she did not state that she would administer CPM therapy differently in her own practice without any reference to the general physical therapy community. While Ms. Allison did not recite the legal definition of the standard of care, we find that her explanation of the standard of care is sufficiently objective. Indeed, Ms. Allison states that in making her conclusions she relied on medical literature and her education. Although the attorney asked whether *in her opinion* use of two CPMs is improper, it is reasonable to infer from Ms. Allison's earlier testimony that she was still applying the objective standard she described with regard to administering CPM therapy to a confused patient.

The principles set forth in *Ladish* do not require that a plaintiff establish the standard of care in a particular manner, only that the plaintiff must adequately inform the jury as to the appropriate standard of care. *Ladish*, 879 S.W.2d at 634. We find that Ms. Allison's testimony adequately describes the standard of care applicable to use of CPM machines regardless of whether she was responding to questions of Plaintiff or of Hospital. Consequently, when viewed in the light most favorable to Plaintiffs, Plaintiffs' evidence adequately established the appropriate standard of care. Hospital's first point is denied.

 In its second point, Hospital argues that the trial court erred in allowing Dr. Abrams to testify that Patient's medical bills were reasonable and necessary because he did not disclose these opinions when Hospital examined him during their deposition. We disagree. We review the trial court's decision to admit or exclude evidence for abuse of discretion. *Harvey v. Washington*, 95 S.W.3d 93, 97 (Mo. banc 2003). Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Green v. Fleishman*, 882 S.W.2d 219, 223 (Mo.App.1994). If reasonable persons can differ about the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion. *Id.*

 Rule 56.01(b)(4) sets forth the requirements for obtaining discovery of facts and opinions held by experts.[1] Under Rule 56.01(b)(4), a party is entitled to obtain through pre-trial discovery by interrogatories or by deposition the facts known and opinions held by experts whom the other party expects to call as a witness

at trial. *Id.; Gassen v. Woy*, 785 S.W.2d 601, 603 (Mo.App.1990). Where a party responds to an interrogatory and subsequently learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing, a party has a duty to seasonably amend the prior response. Rule 56.01(e). Although Rule 56.01(e) does not refer to answers given during a deposition, the discovery rules and case law establish the principle that when an expert witness has been deposed and later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition. *Gassen*, 785 S.W.2d at 604.

In this case, during the course of discovery, Hospital made an interrogatory request for information regarding any experts Plaintiffs intended to produce and about what subject matter the experts intended to testify. Plaintiffs responded that Dr. Abrams was expected to testify about Patient's condition and treatment and the reasonableness of the medical bills stemming from those treatments. When Hospital took Dr. Abrams's deposition, they did not ask any questions regarding the reasonableness of Patient's medical bills. At the conclusion of the deposition, the following exchange occurred:

Q. Have I gotten all your opinions just by accident?

A. Well, I think by design. I certainly wouldn't deem your skill of getting my opinion, but I'm gonna have to give you my standard caveat which al-

---

**1.** All references to Rules are to Mo. R. Civ. P.2005 unless otherwise indicated.

ways makes everybody cringe: I only answer questions, you know. I don't propound them, okay?

Q. At least you're not—

A. And I think that you know me, that I wouldn't try to in any way deceive you.

Q. Right.

A. I don't know what [Plaintiffs' attorney] is gonna ask me, but I think that you have generally covered, you know, what I would anticipate her asking me.

Plaintiffs deposed Dr. Abrams about four months later. During Plaintiffs' examination of Dr. Abrams, Dr. Abrams testified regarding the reasonableness of Patient's medical bills over Hospital's objection. The trial court permitted Plaintiff to play a videotape of this deposition at trial.

Relying on *Gassen*, Hospital argues that Dr. Abrams did not mention that Plaintiffs may ask him questions regarding the reasonableness of Patient's medical expenses when he stated that Hospital generally covered the opinions about which he anticipated Plaintiffs would ask him during Hospital's deposition. Consequently, Hospital contends that Plaintiffs had a duty to disclose to Hospital that they would ask him questions regarding the additional subject matter of the reasonableness of Patient's medical bills and present this testimony at trial. While we agree with the principle set forth in *Gassen*, we disagree that a violation occurred in this case.

In *Gassen*, the defendant's expert changed his opinion testimony at trial, warranting trial court action to minimize the surprise to the plaintiff. 785 S.W.2d at 602–03. In contrast, Dr. Abrams did not change his opinion or base it on new or different facts from those disclosed to Hospital. Notwithstanding his statement that

he thought Hospital generally covered what Plaintiffs were going to ask him, Dr. Abrams specifically stated that he was answering the questions propounded to him. Hospital does not argue that any of Dr. Abrams's answers regarding subject matter covered at their deposition differed from any subsequent responses. Thus, since any testimony regarding the reasonableness of Patient's medical bills would not be a new opinion or an opinion based on new or different facts, Plaintiffs were under no duty to amend Dr. Abrams's responses. Since Plaintiffs disclosed to Hospital prior to the deposition that they would ask for Dr. Abrams's opinion with regard to the reasonableness of Patient's medical bills, the trial court did not abuse its discretion in admitting Dr. Abrams's testimony. Hospital's second point is denied.

■ In its third point, Hospital argues that the trial court erred in failing to order periodic payments of future damages pursuant to section 538.220.[2] Under section 538.220.2, at the request of any party made prior to entry of judgment, the trial court shall include in the judgment a requirement that future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds $100,000. Because the statute grants the trial court broad discretion in establishing a plan for periodic payment of future damages, we review the trial court's decision in this regard on the basis of arbitrariness. *Davolt v. Highland*, 119 S.W.3d 118, 138 (Mo.App.2003) (citing *Vincent v. Johnson*, 833 S.W.2d 859, 866 (Mo. banc 1992)).

■ Prior to entry of the trial court's judgment, Hospital made a motion for the court to allow it to pay any judgment

2. All statutory references are to RSMo 2000 unless otherwise indicated.

rendered over the amount of $100,000 in installments. The trial court's judgment did not provide for payment in installments and denied Hospital's motion to amend the judgment to allow periodic payments. In their brief, Plaintiffs argue that the trial court's action was proper because Hospital's motion to pay the judgment in installments did not comply with section 538.220.2. While we acknowledge that, by requesting payment in installments for any judgment rendered, Hospital's motion included amounts not subject to periodic payment under section 538.220.2, we find that Hospital's request was in substantial compliance with the statute and sufficient to require the trial court to determine what portion of Plaintiffs' future damages should be subject to periodic or installment payments. *Cf. State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 696 (Mo.App.1990) (granting party's request for change of judge despite her failure to adopt the literal language of the statute since the language of her motion was in substantial compliance with the statute).

Plaintiffs argue under *Davolt* that the trial court had discretion to order no periodic payments despite Hospital's request. We disagree. *Davolt* involved a dispute between the parties with regard to the amount of future damages that should be subject to periodic payments. 119 S.W.3d at 137. The court of appeals affirmed the trial court's decision to reduce the amount subject to periodic payments by $100,000. *Id.* at 138–39. Although the appellate court acknowledged the trial court's broad discretion in establishing a plan for periodic payment of future damages, from which Plaintiffs apparently infer that the trial court can exercise discretion to order no periodic payments, the court also emphasized that, by using the mandatory term "shall," the statute directs the trial court to include in its judgment the requirement that future damages be paid in periodic or

installment payments, either in whole or in part. *Id.* at 138.

*Davolt's* characterization of the word "shall" in section 538.220.2 as mandatory is further bolstered by the legislature's reasons for enacting the statute. As the Missouri Supreme Court observed in *Mahoney v. Doerhoff Surgical Servs., Inc.*, 807 S.W.2d 503 (Mo. banc 1991), it is readily understood from the history and text of Chapter 538 that the enactment is a legislative response to the public's concern over the increased cost of health care and the continued integrity of that system of essential services. *Id.* at 507. To give effect to the legislative intent of Chapter 538, the protections of the chapter must be provided to health care providers. *Redfield v. Beverly Health & Rehab. Servs., Inc.*, 42 S.W.3d 703, 713 (Mo.App.2001). Where properly applied, the statute permits defendants to satisfy a judgment for future damages in periodic or installment payments to help reduce costs to insurance companies and reduce insurance premiums, thereby making medical services less expensive and more available than would otherwise be the case. *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898, 905 (Mo. banc 1992). In light of the legislative policy underlying section 538.220, we find that a trial court is not permitted to disregard the statute's mandatory language and decline to order periodic payments.

Because section 538.220.2 clearly applies to the jury's verdict in this case, we hold that the trial court abused its discretion in failing to establish a plan for periodic or installment payments of Plaintiffs' future damages in whole or in part as required by the statute. Accordingly, we reverse the judgment in this respect and remand the case to the trial court to establish an appropriate plan.

In its final point, Hospital argues that the trial court erred in failing to reduce the judgment because the jury awards for future medical damages and future economic damages exceeded the amounts demonstrated by Plaintiffs' evidence. Specifically, Hospital argues that the jury awarded Plaintiffs $25,000 for future medical damages even though Dr. Ward only projected $13,523 in future medical expenses. With regard to future economic damages, Dr. Ward projected a total of $115,360, yet the jury awarded Plaintiffs $187,000.

 The assessment of damages is primarily the function of the jury. *Ince v. Money's Bldg. & Dev., Inc.*, 135 S.W.3d 475, 478 (Mo.App.2004). We will not disturb a trial court's entry of judgment on a jury verdict unless there is an abuse of discretion either by the trial court or by the jury. *Id.* In addition, if the amount of the award is within the range of evidence, that determination is not erroneous although it is not precisely in accordance with the evidence of either of the parties. *Carmel Energy, Inc. v. Fritter*, 827 S.W.2d 780, 783 (Mo.App.1992).

In support of its argument, Hospital cites *Hobbs v. Harken*, 969 S.W.2d 318 (Mo.App.1998) and *Ince.* In *Hobbs,* the appellate court reversed a jury's verdict because it was based on an unreliable expert opinion estimating the plaintiff's future damages. 969 S.W.2d at 325. In particular, the expert's assumption that the plaintiff's condition would last for twenty years lacked evidentiary support so that a verdict based on the expert's testimony was not supported by admissible evidence. *Id.* Because the jury awarded the plaintiff an amount in excess of the future lost earnings and medical expenses testified to by the expert, the court could not say that the size of the verdict was not prejudicial, requiring a reversal and remand for new trial on all issues. *Id.*

In *Ince,* the evidence demonstrated that the maximum total damages for the cost of repair and diminution of value for the plaintiffs' home was about $183,000. 135 S.W.3d at 480. The appellate court held that the jury's verdict of $420,000 exceeded the upper limit of fair and reasonable compensation for damages sustained by the plaintiffs. *Id.* The court then affirmed the judgment on condition of remittitur. *Id.*

 Unlike the verdicts in *Hobbs* and *Ince,* the damages amounts in this case are not based on faulty assumptions and do not exceed the upper limit of fair and reasonable compensation for damages sustained by Plaintiffs. As Plaintiffs note in their brief, the jury heard evidence of other medical expenses in addition to those Dr. Ward testified to, including the need for special shoes, which currently cost about $200 a pair, and the need to replace Patient's $2000 braces over the course of Patient's sixteen-year life expectancy, resulting in an $11,000 expense after replacement every three years. The jury did not abuse its discretion in considering these expenses in addition to those included in Dr. Ward's projection.

 As to Plaintiffs' future economic expenses, the jury did not abuse its discretion in considering Dr. Ward's testimony that his projection was based on a conservative estimate of Plaintiffs' lost earnings in light of the nature of Plaintiffs' business. For instance, Dr. Ward testified that Plaintiffs only drew out of the corporation what they needed to live on (about $20,000 per year) and that an owner's actual salary from a family-owned business is only part of the owner's compensation. Finally, Dr. Ward specifically stated that his projection assumed that Patient would retire at about sixty-five years old, yet Plaintiffs testified

that Patient intended to work well beyond sixty-five. Thus, the jury's award of Plaintiffs' future economic damages was within the range of evidence. *Carmel Energy*, 827 S.W.2d at 783. Hospital's fourth point is denied.

We reverse the judgment insofar as it fails to comply with section 538.220.2 and remand for a determination of the manner in which future damages shall be paid in periodic or installment payments. In all other respects, the judgment is affirmed. Costs on appeal shall be borne by Hospital.

LAWRENCE E. MOONEY, P.J., and MARY K. HOFF, J., concur.